In re SUNBEAM CORP., Debtor.

Official Committee of Unsecured Creditors of Sunbeam Corporation, on behalf of the estate of Sunbeam Corporation, Plaintiff,

v.

Morgan Stanley & Co., Inc., Morgan Stanley Senior Funding, Inc., First Union National Bank, and Bank of America National Trust and Savings Association, Defendants.

Bankruptcy No. 01–40291 (AJG).
Adversary No. 01–2886A.

United States Bankruptcy Court,
S.D. New York.

Oct. 18, 2002.

Weil Gotshal & Manges, LLP, Diane Harvey, of counsel, New York City, for Debtor.

Kasowitz, Benson, Torres & Friedman, LLP, David M. Friedman, of counsel, New York City, for Official Committee of Unsecured Creditors.

Wachtell, Lipton, Rosen & Katz, Theodore Gewertz, of counsel, New York City, for Morgan Stanley Senior Funding, Inc.,

1. The original complaint was filed on July 13, 2001. On August 15, 2002, the parties that filed the current motions to dismiss filed motions to dismiss the original complaint. The

First Union National Bank, Bank of America National Trust & Savings Association, and Morgan Stanley & Co., Inc.

## MEMORANDUM DECISION GRANTING MOTIONS TO DISMISS AMENDED COMPLAINT

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Before the Court are two motions, each dated October 1, 2001, to dismiss portions of an Amended Complaint,[1] dated September 6, 2001 (the "Amended Complaint"). The Amended Complaint was filed by the Official Committee of Unsecured Creditors (the "Committee") against (i) Morgan Stanley Senior Funding, Inc. ("MSSF"), (ii) First Union National Bank ("First Union"), (iii) Bank of America National Trust & Savings Association ("BANTSA") (collectively, the "Lenders") who are holders of secured claims in excess of $1.6 billion against Sunbeam Corp. ("Sunbeam" or the "Debtor"); and (iv) Morgan Stanley & Co., Inc. ("Morgan Stanley," and collectively with the Lenders, the "Defendants"). The Amended Complaint seeks to equitably subordinate, or equitably disallow, the claims of all of the Defendants; to avoid and recover for the estate the Lenders' claims and liens as fraudulent conveyances; to recover damages for Morgan Stanley's alleged gross negligence and for Morgan Stanley allegedly having aided and abetted fraud and aided and abetted breach of fiduciary duty; and to recoup from MSSF's claims against the Debtor, all of the Debtor's claims against what the Committee refers to as the Morgan Stanley entities.

August 15, 2002 motions to dismiss were rendered moot by the filing of the Amended Complaint.

One motion to dismiss was filed by the Lenders and the other by Morgan Stanley. The two motions seek dismissal of the Amended Complaint for lack of standing to pursue the action, pursuant to Fed. R.Civ.P. 12(b)(6) and Fed. R. Bankr.P. 7012(b) for failure to state a claim upon which relief can be granted, and pursuant to Fed.R.Civ.P. 9(b) and Fed. R. Bankr.P. 7009 for failure to state fraud with the requisite particularity. The Debtor supports the relief sought in the two motions to dismiss.

## DISCUSSION

Fed.R.Civ.P. 12(b)(6) is incorporated into bankruptcy procedure by Fed. R. Bankr.P. 7012(b). In considering a 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465 (2d Cir. 1995). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992).

In considering such a motion, although the Court accepts all the factual allegations in the complaint as true, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 106 S.Ct. 2932, 2944 92 L.Ed.2d 209 (1986). Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000).

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998). Pursuant to Fed.R.Civ.P. 8(a), which is made applicable to adversary proceedings by Fed. R. Bankr.P. 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Conley,* 355 U.S. at 47–48, 78 S.Ct. at 103. Based upon the liberal pleading standard established by Rule 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997). In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter. *Id., citing, Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 600 (2d Cir.1991) (other citations omitted).

In reviewing a 12(b)(6) motion, the court may consider the allegations in the complaint, exhibits attached to the complaint or incorporated therein by reference, matters of which judicial notice may be taken, *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993), and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Industrs. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991). However, mere notice or possession of the document is not sufficient. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). Rather, a necessary prerequisite for the court's consideration of the document is that a plaintiff relied "on the terms and effect of a docu-

ment in drafting the complaint." *Id.* As such, the document relied upon in framing the complaint is considered to be merged into the pleading. *Id.* at 153 n. 3. (citation omitted). In contrast, when assessing the sufficiency of the complaint, the court does not consider extraneous material because considering such material would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. *Id.* at 154.

Finally, to survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh the evidence which may be offered to support it. *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998).

Thus, for the purposes of this motion to dismiss, the Court accepts as true all of the material allegations in the Committee's complaint.

### The Amended Complaint

The Amended Complaint alleges that Morgan Stanley acted as underwriter in connection with Sunbeam's offering of certain convertible notes (the "Note Offering") at the same time that it acted as financial advisor to Sunbeam in connection with Sunbeam's acquisition of three entities (the "Acquisitions")—The Coleman Company, Inc.; First Alert, Inc.; and Signature Brands USA, Inc. In this dual capacity, the Amended Complaint alleges that Morgan Stanley was conflicted. The Amended Complaint details alleged fraudulent activity by certain of Debtor's senior management (the "Insiders"). It is alleged that, in its dual role as underwriter in the Note Offering and advisor concerning the Acquisitions, Morgan Stanley aided and abetted the fraudulent activity of the

Insiders. According to the Amended Complaint, Morgan Stanley committed gross negligence by (i) failing to uncover the Insiders fraudulent activity, and (ii) recklessly advising Sunbeam to proceed with the Acquisitions by rendering a "Fairness Opinion" to Sunbeam that the Acquisitions were fair to Sunbeam from a financial point of view based on a synergy analysis when, according to the Committee, the amounts paid for the Acquisitions were excessive. It is alleged that the Fairness Opinion issued by Morgan Stanley was based on evaluations prepared by Coopers & Lybrand upon which Morgan Stanley relied without independent verification. It is also alleged that the Lenders extended financing (the "Bank Facility") to Sunbeam in 1998 and Sunbeam used the proceeds from the Bank Facility to finance the Acquisitions while Sunbeam was insolvent or, alternatively, that the Acquisitions caused Sunbeam to become insolvent.

The Amended Complaint alleges that Morgan Stanley, as underwriter, lured investors into purchasing the Notes to finance the Acquisitions. It is alleged that the purpose of the Note Offering was to use the proceeds to bolster the creditworthiness of the Lenders' loan. This was allegedly accomplished because pursuant to the Indenture upon which the Notes were issued, the Notes were contractually subordinated to the indebtedness under the Bank Facility and the proceeds of the Note Offering would provide a substantial "cushion" for repayment of the loan. It is further alleged that the Lenders would only provide financing conditioned on the issuance of the Notes. After the Note Offering closed, the Lenders issued a commitment letter on the loan. The borrowings under the loan were guaranteed by the Debtor's direct and indirect subsidiaries and, as such, the Bank Facility was structurally senior to the Notes.

The Committee alleges that Morgan Stanley committed fraud by omitting and misrepresenting material facts concerning Sunbeam's financial condition when acting as underwriter for the Note Offering and inducing the purchase of the Sunbeam Notes. In its capacity as underwriter, Morgan Stanley consented to a March 19, 1998 press release with allegedly material misrepresentations of Sunbeam's financial condition. It is alleged that Morgan Stanley received information that should have alerted it to the fact that Sunbeam would not meet the projections set forth in the press release and it therefore was misleading. It is further alleged that once the press release was issued, a representative of the accounting firm Arthur Anderson opposed its inclusion with the offering materials distributed for the Notes but that Morgan Stanley proceeded to include the press release in those materials. It is also alleged that the Noteholders relied on the misrepresentations, were not aware that they were false, and have suffered injury as a result. Further, this alleged fraud injured the Noteholders and other unsecured creditors.

In the Amended Complaint, it is further alleged that MSSF is the alter ego of Morgan Stanley and as such, Morgan Stanley's alleged misconduct can be imputed to MSSF. It is also alleged that BANT-SA and First Union's participation in the Bank Facility is actionable because the misconduct of Morgan Stanley can be imputed to BANTSA and First Union on an agency theory or because BANTSA and First Union willingly accepted the benefits of the Note Offering, knowing that such was the product of fraud, or by recklessly disregarding that fact.

### First Claim for Relief

With respect to the first claim for relief in the Amended Complaint, the Committee seeks to equitably subordinate the claims of all of the Defendants.

The Lenders argue that the equitable subordination claim must be dismissed as to them because, while alleging misconduct by Morgan Stanley, the Amended Complaint does not allege any inequitable conduct by the Lenders or any basis to attribute Morgan Stanley's alleged inequitable conduct to the Lenders.

Morgan Stanley argues that the claim for equitable subordination against it must be dismissed because in order to equitably subordinate a claim, the claimant itself must have engaged in the inequitable conduct and Morgan Stanley is not a claimant as it has not filed a proof of claim in this case.

### Equitable Subordination

11 U.S.C. § 510(c) provides, in relevant part, that:

(c) ... the court may

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part or an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

The Bankruptcy Code does not set forth the "principles of equitable subordination." Rather, Congress intended for existing case law to establish the framework for its development. *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 n. 3 (Bankr. S.D.N.Y.1994), *citing*, S. Rep. No. 95–989, 95th Cong., 2d Sess. 74 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; 124 Cong.Rec. H11,095 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); An-

drew De Natale & Prudence B. Abram, The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors, 40 Bus. Law 417, 421 (1985). Thus, pre-Bankruptcy Code cases which interpret the doctrine of equitable subordination continue as authoritative precedent. *Nassau Assocs.*, 169 B.R. at 837 n. 3. Indeed, in considering the doctrine under the Bankruptcy Code, courts have relied on the three-prong test set forth in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir.1977), a proceeding under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701 *et seq.* (1970).

■ The elements of the *Mobile Steel* test are as follows:

(i) the claimant must have engaged in some type of inequitable conduct;

(ii) the misconduct must have resulted in injury to the creditors ... or conferred an unfair advantage on the claimant;

(iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [law].

*Mobile Steel*, 563 F.2d at 700.

■ A bankruptcy court's "general equitable power to adjust equities among creditors in relation to the liquidation results" is the source of the bankruptcy court's power to subordinate claims. *Nassau Assocs.*, 169 B.R. at 837. The equitable goal is to prevent injustice or unfairness in the bankruptcy context. *Id.* This is accomplished by permitting the court to subordinate an otherwise legally valid claim when the claimant has engaged in conduct that makes it unjust or unfair for the claimant to share pro rata with similarly situated creditors. *Id.*

■ Equitable subordination can only be used to reorder priorities, not to disallow claims. *Nassau Assocs.*, 169 B.R. at 837. Moreover, pursuant to the express terms of Bankruptcy Code § 510(c), claims may only be subordinated to other claims and interests may only be subordinated to other interests.

*Inequitable Conduct*

■ The type of misconduct that warrants equitable subordination of a claim includes instances where there has been:

(i) fraud, illegality or breach of fiduciary duty;

(ii) undercapitalization; and

(iii) control or use of the debtor as an alter ego for the benefit of the claimant.

*Nassau Assocs.*, 169 B.R. at 838. *See also Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1359–60 (1st Cir.1992) (noting that equitable subordination applies when the debtor's fiduciary misuses his position to disadvantage other creditors, when a third party dominates or controls a debtor to disadvantage others, or when a third party defrauds other creditors.)

■ However, even lawful conduct may be considered inequitable if it "shocks one's good conscience." *Nassau Assocs.*, 169 B.R. at 837. This is because, as an "integrated proceeding," the bankruptcy case "concerns not only the legal validity of the claim but also claimant's right to share in the estate." *Id.* If a claimant has engaged in inequitable conduct, its claim may be equitably subordinated irrespective of whether that conduct is related to the acquisition or assertion of the claim. *Mobile Steel*, 563 F.2d at 700.

■ A higher level of proof is required to equitably subordinate the claim of a party that is neither an insider of the debtor, nor a fiduciary to the debtor or other creditors. *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.)*, 210 B.R. 508, 515 (Bankr.

S.D.N.Y.1997). This is because, absent receipt of a preference or fraudulent transfer, a creditor may ordinarily improve its position in relation to other creditors. *Id.* at 515. Courts are "reluctant to find the requisite level of misconduct in 'arms-length' transactions between borrowers and lenders." *Columbus Ave.*, 968 F.2d at 1361.

When a non-insider or non-fiduciary is involved, courts have required that a claimant's conduct be egregious and severely unfair to other creditors before its claim will be equitably subordinated. *Columbus Ave.*, 968 F.2d at 1360. The conduct required has been described as "substantial misconduct tantamount to fraud, misrepresentation, overreaching or spoilation." *Nassau Assocs.*, 169 B.R. at 838–39. Few cases find that non-insider, non-fiduciary claimants meet this standard. *Granite Partners*, 210 B.R. at 515.

The conduct alleged must "violate[ ] a generally recognized duty that exists outside of bankruptcy law." *Nassau Assocs.*, 169 B.R. at 839. Thus, to defeat a motion to dismiss, the facts must allege that the claimant committed fraud or some other illegal action, or that the claimant breached some legal duty that it owed to the debtor or its creditors. *Granite Partners*, 210 B.R. at 508.

### Injury to Creditors or Unfair Advantage to the Claimant

The second element of the *Mobile Steel* test requires a finding that the claimant's conduct injured the debtor or its creditors or resulted in an unfair advantage to the claimant. Moreover, when a court finds that the claimant's conduct warrants equitable subordination of its claim, as equitable relief is remedial and not penal, that claim is "subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *Mobile Steel*, 563 F.2d at 701. The injury suffered sets the limits of the remedy regardless of the nature of the claimant's conduct. *Nassau Assocs.*, 169 B.R. at 840.

### Not Inconsistent with the Bankruptcy Code

The third requirement of the *Mobile Steel* standard is that any equitable subordination of a claim not be inconsistent with bankruptcy law. This element recognizes that the doctrine is not a mechanism to be used by courts to alter the statutory scheme in an effort to reach a result the court considers more equitable than the distribution scheme provided for in the Bankruptcy Code. *Nassau Assocs.*, 169 B.R. at 841.

As the first requirement for equitable subordination is that the claimant itself engaged in the inequitable conduct, the Lenders and Morgan Stanley argue that their claims cannot be subordinated under this theory. The Lenders argue that they are claimants but the inequitable conduct alleged was not their conduct but, rather, the conduct of Morgan Stanley. Morgan Stanley argues that it is not a claimant as it has not filed any proof of claim in this case.

The Committee contends that the Lenders were lenders under the Bank Facility in name only and that there was an alter ego or agency relationship between Morgan Stanley and MSSF and, therefore, the inequitable conduct alleged against Morgan Stanley can be imputed to MSSF. The Committee further alleges that there was also an agency relationship between Morgan Stanley and BANTSA and First Union which would allow for Morgan Stanley's conduct to be imputed to BANTSA and First Union.

### Alter Ego Liability

In determining whether the corporate form will be disregarded and the corporate veil pierced, the law of the state of incorporation is applied. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). Morgan Stanley and MSSF are Delaware corporations, therefore, Delaware law applies.

Under Delaware law, the corporate veil of an entity can be pierced "where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner." *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del.Ch.1992). As the applicable standard is in the alternative, there is no requirement of a showing of fraud when relying on the alter ego theory of liability. *Fletcher*, 68 F.3d at 1457.

To establish alter ego liability under Delaware law, what must be shown is:

(1) that the parent and the subsidiary operated as a single economic entity; and

(2) that an overall element of injustice or unfairness is present.

*Fletcher*, 68 F.3d at 1457. (citations and internal quotation marks omitted). Thus, although fraud need not be shown, it is required that an overall element of injustice or unfairness be shown. *Fletcher*, 68 F.3d at 1458.

A court considers various factors in determining whether the parent and subsidiary "operated as a single economic entity such that it would be inequitable . . . to uphold a legal distinction between them." *Fletcher*, 68 F.3d at 1458. (citations omitted). The relevant factors to consider include:

- whether the corporation was adequately capitalized for the corporate undertaking;

- whether the corporation was solvent;

- whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed;

- whether the dominant shareholder siphoned corporate funds; and

- whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Fletcher*, 68 F.3d at 1458.

However, even in the absence of allegations of these specific factors, a court may not grant a motion to dismiss where the plaintiff has made other relevant allegations. *Union Carbide Corp. v. Montell N.V.*, 944 F.Supp. 1119, 1145 (S.D.N.Y. 1996).

The purpose of allowing the corporate veil to be pierced on an alter ego theory is to hold the party actually responsible for the inequitable conduct accountable and to prevent that corporation from "using another corporation to shield itself from liability." *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F.Supp.2d 407, 432 (S.D.N.Y.2000), *citing,* 1 WILLIAM MEADE FLETCHER ET AL, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 41.10, at 577–78 & § 41.20, at 596.

Nevertheless, courts are reluctant to disregard the corporate structure unless provided with a sufficient rationale. *Fletcher*, 68 F.3d at 1458. Therefore, a high standard must be met before alter ego liability is warranted. *Gabriel Capital,* 122 F.Supp.2d at 432.

Ordinarily the determination of the nature and extent of domination is a question of fact. *Union Carbide,* 944 F.Supp. at 1145. However, there are instances "where courts have granted motions to dismiss as well as motions for summary judgment in favor of defendant

parent companies where there has been a lack of sufficient evidence to place the alter ego issue in dispute." *See Fletcher,* 68 F.3d at 1458 (citing cases).

To support a claim for alter ego liability and establish that the subsidiary was a mere facade for the dominant shareholder, it is not sufficient to show "mere domination and control" of the subsidiary by the parent corporation. *Outokumpu Eng'g. Enters., Inc. v. Kvaerner Enviropower, Inc.,* 685 A.2d 724, 729 (Sup. Ct.Del.1996). Rather, the domination shown must be "complete domination of the corporation" concerning the transaction in issue. *Union Carbide Corp. v. Montell N.V.,* 944 F.Supp. 1119, 1144 (S.D.N.Y.1996). The extent of the domination and control must preclude the controlled entity from having "legal or independent significance of its own." *Wallace v. Wood,* 752 A.2d 1175, 1184 (1999). There must be an abuse of the corporate form to effect a fraud or an injustice— some sort of "elaborate shell game." *Outokumpu,* 685 A.2d at 729.

Finally, while it is not sufficient, at the pleading stage, to make conclusory allegations of control, *Union Carbide Corp.,* 944 F.Supp. at 1144–45, nevertheless, setting forth some examples of alleged domination may provide sufficiently specific factual allegations to support an alter ego claim and result in denial of the motion to dismiss. *See Union Carbide,* 944 F.Supp. at 1145; *Geyer,* 621 A.2d at 793.

### Agency

There are two theories of agency for determining whether a parent may be liable for actions by a subsidiary, one is complete dominion and control and the analysis is similar to that used for alter ego, the other is "the standard principal/agent concept often involving but not

necessarily requiring a parent and subsidiary." *Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower Inc.,* 685 A.2d at 730 (Del.Supr.1996). While the former uses an alter ego type of analysis and requires that total dominance of the subsidiary by the parent be proven, the latter does not require a showing of complete dominance because customary agency principles may apply whether the parties are parent and subsidiary or completely unrelated apart from the specific transaction where they may have assumed roles of principal and agent. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir.1988). In considering traditional agency principles the focus of the inquiry is on the relationship between the two entities as it bears on the alleged wrong. *Id.*

Even under traditional agency relationship analysis where total domination need not be proven, in considering whether an agency relationship is present, the most essential element is a finding that the principal *directs* and *controls* the agent's action. *Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf,* 930 F.2d 240, 244 (2d Cir.1991); *see also Abex, Inc. v. Koll Real Estate Group, Inc.,* 1994 WL 728827 *14 (Del.Ch.1994) (noting that the right to control is the critical factor in establishing an agency relationship).

Moreover, acting in the name of another, by itself, does not make one an agent. Rather, "[t]o be an agent, one must have been appointed by the principal and be subject to the principal's orders." *Abex, Inc.,* 1994 WL 728827 at *15 *citing,* RESTATEMENT (SECOND) OF AGENCY §§ 1 and 14.

### Application of the Facts, as Alleged, to the "Alter Ego" and "Agency" Theories

The Committee argues that the alter ego theory applies because Morgan

Stanley and MSSF operated as a single economic unit and therefore there should be no distinction between them. The Committee alleges that MSSF was just named as the lender in the loan documents but that Morgan Stanley really controlled the entire process.

With respect to the alter ego theory, the Defendants maintain that mere control of one entity by another is not sufficient to pierce the corporate veil. The Defendants also contend that because the Committee has not alleged any of the *Fletcher* factors, their motion must be dismissed.

The Amended Complaint contains no allegation concerning the *Fletcher* factors. Most relevant, there are no allegations that MSSF was undercapitalized, or that it had no business operations, or that its finances were intermingled with those of Morgan Stanley. Nevertheless, even in the absence of allegations of *Fletcher* factors, in certain cases, it may be proper to deny a motion to dismiss where there are other specific relevant allegations.

In this case, the Committee argues that the corporate veil should be pierced because of Morgan Stanley's purported control and dominance over its affiliate, MSSF, throughout the entire process leading to the extension of the Bank Facility. The Committee alleges that the allocation of responsibility concerning the Bank Facility was to be determined solely by Morgan Stanley. The Committee also alleges that Morgan Stanley did not distinguish between itself and MSSF in its engagement letter to Sunbeam or in the Note offering. The Committee further alleges that in addition to its oversight over MSSF's actions concerning the Bank Facility, MSSF did not perform any due diligence and had no independent discretion. The Committee asserts that MSSF's role was merely to be named a lender on the Bank Facility.

The Committee's assertion that MSSF had no discretion is conclusory. The Committee has had ample discovery and has not provided factual support for this assertion. Moreover, the Court does not credit the Committee's reference to Morgan Stanley's alleged failure to distinguish between itself and MSSF in Morgan Stanley's engagement letter to Sunbeam or in the Note Offering because in both instances, despite the Committee's allegation to the contrary, Morgan Stanley clearly referenced the fact that either it or "its affiliates" or "an affiliate" would provide the services mentioned in those documents.

In addition, mere domination or control by one entity over another is not sufficient to require piercing of the corporate veil. Rather there must be such complete domination and control that the controlled entity is a mere shell.

Moreover, the purpose in allowing the corporate veil to be pierced is to ensure that an entity who engaged in inequitable conduct is held accountable for its actions and to prevent that wrongdoer from using another entity to shield it from liability. The typical situation arises where an entity completely controls an undercapitalized subsidiary or affiliate and, through that dominance, causes the underfunded-controlled entity to engage in inequitable conduct. When, as a result of that conduct, the injured party attempts to obtain redress, the controlling entity shields itself from liability behind the facade of the shell corporation, while the injured party has no recourse against the undercapitalized shell corporation. In that instance, the corporate form was used to effect a fraud or injustice and the corporate veil is pierced to allow the injured party to obtain redress from the actual wrongdoer who has the wherewithal to pay any damages awarded.

In this case, the allegations of wrongdoing are all based on the conduct of Morgan Stanley. Morgan Stanley's purported wrongful conduct is blamed for the injury to the Noteholders and other unsecured creditors. There is no evidence, however, that Morgan Stanley used MSSF to shield itself from potential liability. Rather, Morgan Stanley has liability exposure to the Noteholders by virtue of its role as underwriter of the Note Offering. Moreover, MSSF is not the typical undercapitalized shell used to shield a related entity from creditors. MSSF had sufficient capital to make the loan and there are no allegations that it did not have sufficient capital to fund its operations generally. Thus, the corporate form was not used to allow Morgan Stanley to escape any liability it might have based on its conduct. The Committee has not presented a sufficient rationale to overcome the reluctance to disregard the corporate structure.

In addition, the Court finds that the Committee has not alleged a sufficient basis upon which to hold MSSF liable for any conduct on Morgan Stanley's part based upon a theory of agency. The Court has rejected application of alter ego liability and as the characteristics of agency based upon complete dominance and control are identical, agency cannot be established on that basis. Under a traditional agency theory, in order to hold the principal liable for the agent's conduct, there would have to be allegations that the principal directed and controlled the agent. There are no allegations in the Amended Complaint that Morgan Stanley acted subject to MSSF's direction and control. Thus, there are no allegations that MSSF controlled Morgan Stanley upon which to conclude that Morgan Stanley was MSSF's agent. Indeed, the Committee has alleged the opposite, that Morgan Stanley controlled MSSF.

The Court, further finds that even if one were to impute Morgan Stanley's conduct to MSSF, the allegations in the Amended Complaint would be insufficient to hold First Union or BANTSA liable on a theory of agency. There are no allegations that First Union or BANTSA controlled either Morgan Stanley or MSSF. The Committee referenced the titles given the Lenders under the documents—Syndication Agent, Documentation Agent, and Administrative Agent. However, merely having been given a title does not establish an agreement by one to be subject to another's control. The titles by themselves do not set forth legal relationships. In any case, the alleged inequitable conduct by Morgan Stanley sought to be imputed to MSSF would be outside of its scope as syndication agent and could not therefore be imputed to its principal even if it were established that First Union and BANTSA were the principals of MSSF in its role as syndication agent. Aside from the reference to the titles, there are no allegations in the Amended Complaint that specifically reference anything in the loan documents or in the agreement between the Lenders establishing an agreement by MSSF to be subject to the control of First Union or BANTSA. Nor are there any allegations that First Union or BANTSA directed any specific actions of either Morgan Stanley or MSSF. Thus, the allegation that Morgan Stanley and MSSF acted as agent for First Union and BANTSA in connection with the Bank Facility is conclusory. Moreover, there is no allegation that Morgan Stanley acted as agent for First Union and BANTSA in connection with the Note Offering or the Acquisitions. Yet, it is Morgan Stanley's conduct in relation to the Note Offering and Acquisitions that form the basis for its allegedly inequitable conduct.

The Committee argues that First Union and BANTSA are also liable based on

their own actions. In the Amended Complaint, the Committee alleges that BANTSA and First Union failed to conduct due diligence concerning the March 19, 1998 press release issued by Sunbeam which was purportedly fraudulent.[2] However, in connection with their extension of the loan as part of the Bank Facility, failure to conduct such due diligence cannot be considered inequitable conduct as the Lenders did not have a duty to conduct due diligence concerning the press release. Nor is the Lenders' decision to attempt to syndicate all or a portion of the loan evidence of inequitable conduct as syndication of large loans is common, and acceptable, practice.

None of the allegations directed at the Lenders themselves, as opposed to those directed to Morgan Stanley and attempted to be imputed to the Lenders, are the type of gross and egregious conduct required to equitably subordinate a claim.

The allegations in the Amended Complaint do not provide a basis to impute Morgan Stanley's conduct to MSSF, under either an alter ego or agency theory. Nor is there any basis to find First Union or BANTSA liable on a theory of agency. In addition, there are no allegations in the Amended Complaint concerning actionable inequitable conduct by the Lenders themselves. Thus, the Court grants the Lenders motion to dismiss the first claim for relief.[3]

*Second Claim for Relief*

Concerning the second claim for relief which seeks to avoid the Lenders' claims and liens as fraudulent conveyances, the Committee argues that the loans were earmarked for the Acquisitions at a time when the Lenders knew or recklessly disregarded that Sunbeam would not receive reasonably equivalent value for the loans. Further, the Committee notes that as security for the loans, Sunbeam and its subsidiaries conveyed security interests in their respective property to the Defendants. The Committee contends that the Acquisitions, and the incurrence of the debt and transfer of the security interests related to the Bank Facility, reduced Sunbeams's assets available to other creditors. The Committee urges that the Court consider the Bank Facility and the Acquisitions a single integrated transaction. Further, the Committee contends that this series of transactions occurred at a time when Sunbeam was insolvent or, alternatively, the transactions caused Sunbeam to become insolvent.

The Lenders move to dismiss this claim for relief arguing first that the Amended Complaint fails to allege the absence of fair consideration or reasonably equivalent value with the requisite particularity. In addition, the Lenders argue that the facts do not warrant "collapsing" the loan transaction and the Acquisitions into a single integrated transaction. The Lenders maintain that the transaction pursuant to which Sunbeam borrowed from the Lend-

---

**2.** The Committee contradicts this assertion in ¶ 74 of the Amended Complaint where it is alleged that First Union and BANTSA performed due diligence on Sunbeam's revenues and short falls.

**3.** With respect to the request for equitable disallowance of the Lenders' claims, the Court need not address the issue of the continued viability of such doctrine after the enactment of § 510(c). The Committee concedes

that to the extent equitable disallowance would apply, such disallowance would be based on the same equitable principles as equitable subordination. Inasmuch as the Court has found that the allegations in the Amended Complaint do not support a finding of inequitable conduct sufficient to warrant subordination of the Lenders' claim, they even less support disallowance of such claim.

ers and secured those loans is separate and independent from the transaction under which Sunbeam used certain of the loan proceeds, as well as proceeds of the Note Offering, to make the Acquisitions.

### Collapsing Transactions

■■■ A series of transactions may, under certain circumstances, be "collapsed" and treated as a single transaction for the purpose of determining whether there has been a fraudulent conveyance. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir.1995). This treatment is usually accorded in situations where a debtor who has exchanged property with another for fair consideration then gratuitously transfers that consideration to a third-party. *Id.* When the series of transactions are completed, the debtor remains with nothing while the counter-party to the first transaction receives the property and the counter-party to the second transaction receives the consideration. *Id.*

Although the concept of "collapsing" a series of transactions and treating them as a single integrated transaction has been applied primarily when analyzing a transfer alleged to be fraudulent in the context of a failed leveraged buy-out ("LBO"), it has also been utilized in other contexts. *In re Best Prods. Co., Inc.*, 157 B.R. 222, 229–30 (Bankr.S.D.N.Y.1993) (citing LBO cases, then collapsing sublease between subsidiary and parent corporation which was used as mere financing vehicle and treating loan as having been made directly to parent corporation); *see also, Orr v. Kinderhill Corp.*, 991 F.2d 31, 35–36 (2d Cir.1993) (collapsing transactions concerning corporation's (i) transfer of real property, and (ii) subsequent distribution of stock in transferee corporation, and treating integrated transaction as not supported by fair consideration); *See also, Voest–Alpine Trading Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212–13 (3d Cir.

1990) (collapsing series of transactions as "sham" where transactions were designed to deprive a company's unsecured creditors of access to its assets by rendering company insolvent through foreclosure and transferring its assets to another company without fair consideration).

Courts have "collapsed" a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction. *Best Prods. Co.*, 157 B.R. at 229; *Voest–Alpine*, 919 F.2d at 213. Focusing on the knowledge and intent of the parties involves a fact intensive case-by-case analysis. *Best Prods. Co.*, 157 B.R. at 229.

■■■ Where a transfer is actually "only a step in a general plan," an evaluation is made of the entire plan and its overall implications. *Orr v. Kinderhill Corp.*, 991 F.2d at 35. A loan may appear to provide fair consideration because the lender provided funds to an entity in exchange for a security interest. If, however, the proceeds of that loan are transferred to a third-party for less than fair consideration, the transactions may be collapsed and the initial lender's transfer deemed fraudulent if that initial transferor was intimately involved in the formulation or implementation of the plan by which the proceeds of the loan were channeled to the third-party. *Voest–Alpine*, 919 F.2d at 212–13, *citing, U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1303 n. 8 (3d Cir. 1986). Where the evidence shows that the parties knew or should have known that the ultimate use of the funds would deplete the assets of a corporation, a court disregards the formal structure. *Lippi v. City Bank*, 955 F.2d 599, 612 (9th Cir.1992). Nevertheless, a lender may extend a loan

to an entity even if it is aware that the borrower ultimately intends to use the funds to repay antecedent debt, *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 249 (2d Cir.1987), or to invest in a speculative venture. *In re Greenbrook Carpet Co.*, 722 F.2d 659, 661 (11th Cir. 1984). Where the funds are ultimately used for legitimate corporate purposes, then the transfer is not fraudulent even if the series of transactions are viewed as a single integrated transaction. *HBE Leasing*, 48 F.3d at 637.

■ To render the initial transferee's exchange with a debtor fraudulent, that transferee must have had either actual or constructive knowledge of the entire scheme. *HBE Leasing*, 48 F.3d at 635. Constructive knowledge is attributed to a party if it was aware of circumstances that would ordinarily lead one to inquire further but it failed to do so. *Id.* at 636. Although certain courts attribute the transferees who fail to make appropriate inquiries with the knowledge that would have been gained from ordinary diligence, other courts require a "more active avoidance of the truth," such as consciously turning away from knowledge. *Id.* (citations omitted).

### *Application of the Facts, as Alleged, to the Collapsing Theory*

■ In order for the Committee to prevail on its collapsing theory, it is necessary to treat the transaction concerning the borrowing from the Lenders and the securing of the loan, the transaction concerning the Note Offering, and the transaction concerning the use of the loan proceeds to buy the Acquisitions as one integrated transaction.

The Committee argues that although the $1.6 billion advanced to the Debtor provided fair consideration for the security interest received by the Lenders, the Lenders knew that proceeds from the loan would be used to purchase the Acquisitions at prices substantially higher than their fair market value and that those purchases were made while the Debtor was insolvent or, alternatively, that the purchases caused the Debtor to become insolvent. The Committee contends that the Lenders were prepared to finance this risky loan because the funds from the Note Offering would supply a cushion for repayment of their loan. Thus, the Committee argues that because the Lenders knew that the ultimate use of the funds would harm the Debtor, the transactions should be collapsed and the Lenders claims and liens should be avoided as fraudulent transfers.[4]

The Lenders argue that the factual allegations do not justify collapsing the transactions because the loan proceeds were used for legitimate corporate purposes. In addition to applying a portion of the proceeds of the Bank Facility for the purchase of the Acquisitions, the Lenders note that in the Amended Complaint, the Committee acknowledges that the documents upon which they rely indicate that the balance of the loan proceeds were to be used to refinance certain existing indebt-

---

4. Citing to the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act, the committee asserts that a party seeking to recover a conveyance as fraudulent must plead that:

   i.  the debtor was insolvent, inadequately capitalized and/or intended to incur debts that it could not repay as they would become due.

   ii. the debtor received less than reasonably equivalent value (also known as "fair consideration") in exchange for the obligation incurred or the property transferred.

   The Committee also cites to N.Y. Debtor & Creditor Law § 272, 273; Fla. Stat. §§ 726.103, 726.104, as containing analogous sections.

edness, to pay related fees and expenses, and to finance ongoing working capital needs. The Lenders maintain that there is no dispute that these additional intended uses are all legitimate corporate expenditures. Moreover, the Lenders argue that it was proper to use a portion of the loan proceeds, together with the proceeds from the Note Offering, to purchase three unrelated companies—each with their own geographic presence, product lines and brand names. As those proceeds were used to acquire other existing companies, each with its own business and assets, the Lenders maintain that the purchases of the Acquisitions were legitimate corporate expenditures even if they were speculative ventures.

The Committee asserts that the Lenders were aware of the structure of the entire transaction in that proceeds from the Bank Facility would be used to purchase the Acquisitions and that closing on the Notes was a condition precedent to closing on the Bank Facility. Thus, the Committee maintains that the Lenders knowingly funded the purchase of the Acquisitions.

An entity, however, may use proceeds of a loan to purchase another business even if it is a speculative venture and the fact that the acquired company later proves unprofitable is not a basis upon which to retroactively impute knowledge that the consideration paid to acquire it far exceeded its value to the purchaser.

The Committee, nevertheless, contends that the Lenders had actual knowledge, after having conducted due diligence, that the Debtor was insolvent and that it was paying an excessive sum to purchase the Acquisitions. In support of this assertion, the Committee references information provided by the current CEO of the Debtor as to the unreliability of the financial analysis upon which the Lenders relied in extending the loan. A deposition upon which the

Committee relied in bringing the Amended Complaint, however, makes clear that the meeting at which the CEO provided this information to the Lenders did not occur until several months after the closing of the Bank Facility.

The Committee's assertion concerning the Lenders purported knowledge of the Debtor's overpayment for the Acquisitions is conclusory as there are no factual allegations to support it. There are no allegations concerning what facts were discovered by the Lenders. Rather, the allegations concern what Morgan Stanley discovered. Moreover, in the Amended Complaint, it is acknowledged that Morgan Stanley found the purchase of the Acquisitions to be fair to the Debtor from a financial point of view based upon the synergy estimates prepared by Coopers & Lybrand and the other financial information provided to it, upon all of which it was entitled to rely without independent verification, in accordance with its engagement. In addition, the Debtor's board of directors approved of the transactions involving the Acquisitions, fully aware of Morgan Stanley's reliance on Coopers & Lybrand's synergy analysis and the other financial information provided to it.

Moreover, the statement made by the Debtor's CEO does not support the Committee's contention that the Lenders knew prior to closing the Bank Facility that the Debtor was insolvent because the CEO's testimony dates the Debtor's insolvency to a period subsequent to the closing of the Bank Facility. Nor are there any allegations that would support the Committee's assertion that the Lender's knew that the purchase of the Acquisitions would render the Debtor insolvent.

Thus, there are no allegations that, prior to closing the Bank Facility, the Lenders knew or consciously avoided discovering

that the Acquisitions were worth substantially less than the Debtors paid for them or that the Debtor was insolvent or that it would be rendered insolvent as a result of the Acquisitions. Nor are there any allegations to support a finding that the Lenders had constructive knowledge that the Debtor was overpaying for the Acquisitions, or that it was insolvent or would be rendered insolvent by the Acquisitions. There are no allegations concerning any facts learned by the Lenders as a result of their due diligence that would have put them on notice of a fraudulent scheme or that would have required further investigation.

As there are no facts alleged in the Amended Complaint to support a finding that the Lenders had either actual or constructive knowledge that the Debtor was insolvent or would be rendered insolvent or that the Acquisitions were valued incorrectly, there is no basis to warrant collapsing the several transactions for the purpose of finding any of the conveyances to be fraudulent.

Therefore, the Court grants the Lenders' motion to dismiss the second claim for relief contained in the Amended Complaint.[5]

### The Third, Fourth and Fifth Claims for Relief

The third, fourth and fifth claims for relief are all asserted against Morgan Stanley. The third claim seeks to recover damages for the estate based upon Morgan Stanley's purported negligence or gross negligence in issuing the Fairness Opinion and recommending that the Debtor proceed with the purchase of the Acquisitions. The fourth claim for relief seeks to recover damages for the estate based on Morgan Stanley's purported role in aiding

and abetting the fraud allegedly committed by the Insiders. The fifth claim for relief seeks to recover damages for the estate based on Morgan Stanley's purported role in aiding and abetting the Insiders in committing breaches of their fiduciary duty as officers of the Debtor.

Morgan Stanley contends that all of the claims for relief asserted against it must be dismissed because the Committee had no authority to commence an adversary proceeding against it as the Committee failed to obtain leave of court to commence the action on behalf of the estate. Alternatively, Morgan Stanley argues that the factual allegations in the Amended Complaint do not support the relief sought.

The Committee argues that the claims against Morgan Stanley should not be dismissed as the Final Order Authorizing Debtor in Possession to Enter into Post–Petition Financing Agreement, dated March 1, 2001 (the "DIP Financing Order"), provides the Committee with the requisite authority to sue Morgan Stanley. Alternatively, the Committee requests that the Court grant it authority to sue, on behalf of the estate, as the Committee asserts that the estate has a colorable claim against Morgan Stanley which the Debtor refuses to pursue.

The DIP Financing Order conferred standing on the Committee to assert or prosecute certain actions against any of the "Pre–Petition Lenders" or "Pre–Petition Agents" and to raise defenses to their claims. The Pre–Petition Lenders and Pre–Petition Agents, as defined, included the Lenders, but not Morgan Stanley. Thus, the DIP Financing Order authorized the Committee to pursue, on behalf of the estate, the Debtor's claims against

---

**5.** Having dismissed the fraud claim because the factual allegations do not support collapsing the transactions, the Court does not reach the issue of the measure of particularity with which the plaintiffs should have pled the alleged fraud.

the Lenders, but not against Morgan Stanley. Nevertheless, the Committee argues that because the DIP Financing Order provided it with authority to assert defenses to MSSF's claims, its action against Morgan Stanley should be viewed as a recoupment defense to MSSF's claim which it is authorized to assert. The argument, however, even if tenable, would depend upon treating Morgan Stanley and MSSF as the same entity, a contention which this Court has already rejected. Thus, the DIP Financing Order did not provide the Committee with authority to commence an action against Morgan Stanley. Alternatively, the Committee now asks the Court to confer authority on it to assert the claims against Morgan Stanley.

In *Unsecured Creditors Committee v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904 (2d Cir.1985), the Second Circuit found that pursuant to 11 U.S.C. §§ 1103(c)(5) and 1109(b), a creditors' committee has a qualified right to initiate an action against a third-party where (i) the trustee or debtor-in-possession unjustifiably fails to bring such action or abuses its discretion in not bringing the action, and (ii) the creditors' committee first obtains the approval of the bankruptcy court to bring the action.

■■■■ In determining whether to allow a creditors' committee to commence an action, a court considers:

    1) whether the creditors' committee has presented a colorable claim; and

    2) whether the action is likely to benefit the reorganization estate.

*In re STN Enterprises*, 779 F.2d at 905. Moreover, a creditors' committee may also acquire standing to pursue a debtor's claims if (1) the debtor in possession or trustee consents to the committee pursuing the claims, and (2) the court finds that allowing the action by the committee is (a) in the bankruptcy estate's best interest,

and (b) is " 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings." *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir.2001).

■■■■ The Committee argues that it is not required to show that pursuing the debtor's claim is "necessary and beneficial" to the fair and efficient resolution of the bankruptcy proceeding because that standard only applies in the case where the debtor has given its consent. The Committee directs the Court's attention to language in the *Commodore* decision where the Second Circuit noted that in the situation where the trustee or debtor-in-possession consents to a committee maintaining suit on a debtor's claim, the committee's suit must be necessary and beneficial to the resolution of the bankruptcy proceeding. *Commodore*, 262 F.3d at 100. From this statement, the Committee concludes that it is not required to meet the "necessary and beneficial" standard when a committee seeks to commence a claim where the trustee or debtor-in-possession have unjustifiably failed to commence that suit. This argument, however, fails to recognize that in those cases where a committee does not obtain the consent of a trustee or debtor-in-possession to bring an action, in order for the Committee to gain the capacity to bring the action itself, it must establish that the debtor has unjustifiably failed to bring such action or abused its discretion in not bringing the action. Any analysis concerning whether a debtor's failure to bring an action was unjustifiable or an abuse of its discretion would require a determination of whether the action was necessary and beneficial to the bankruptcy estate. Thus, a finding that allowing a committee to pursue a debtor's claim would be necessary and beneficial to the resolution of the bankruptcy proceeding is required in all instances.

▓▓▓ The Court finds that the Committee has not met the standards set forth in *STN* and *Commodore* and, therefore, denies its request for leave to commence the derivative action against Morgan Stanley on behalf of the Debtor's estate. The Committee has not shown that the Debtor unjustifiably refused to commence an action against Morgan Stanley as the Committee has not even shown that it consulted with the Debtor in bringing such action. Moreover, any lawsuit brought on behalf of the Debtor's estate against Morgan Stanley would have to overcome the *in pari delicto* defense.[6] In addition, the Committee seeks to pursue claims that will delay resolution of this reorganization proceeding by impeding approval of the pending plan of reorganization. The Committee's pursuit of these claims is not in the best interest of the estate.

Most significantly, the reorganization value of the Debtor has decreased continuously in the last year because of the general market decline in the industry and in the overall economy. At the commencement of this case, a major issue of contention between the Debtor and the Committee was the reorganization value of the Debtor—with the Committee according it a value in excess of $2 billion, while the Debtor contended that the value was approximately half of that amount. More recently, however, at the hearing to consider approval of the Debtor's disclosure statement which was held on October 4, 2002, the Committee acknowledged that for the past year it has recognized that the reorganization value of the Debtor is less than the $1.6 billion owed the Lenders and that the only way in which the unsecured creditors would recover any value is if they were successful in this litigation. The Debtors and the Lenders have argued that the Lenders faced a deficiency in the payment of their claim in excess of $500 million at the commencement of this case and that the deficiency has steadily increased. While the Committee does not concede the extent of the Lender's deficiency claim, the fact that the Committee is no longer disputing the reorganization value is an indication to the Court that the Committee acknowledges that the deficiency is material. As the Court has dismissed the Committee's claim for relief based on equitable subordination and as the Noteholder claims are contractually subordinated, any recovery from an action against Morgan Stanley would first be used to pay the Lenders claims before any payment benefitted the Noteholders or other unsecured creditors. The proposed plan of reorganization provides that the Lenders are to receive 100% of the equity of the reorganized entity. Consequently, the unsecured claimants, including the Noteholders, have no economic stake in the reorganization. It is the Lenders who would benefit from pursuit of any claim against Morgan Stanley and they have chosen not to proceed at this time. As the entities that would benefit from any recovery are not seeking to pursue the claims at this time and as any recovery will not materially impact on the distribution to other creditors, the Committee has not shown that the prosecution of the actions against Morgan Stanley would be necessary and beneficial to the resolution of the bankruptcy proceeding.

As the Court has determined not to grant the Committee leave to commence an action against Morgan Stanley, the Committee may not maintain the third, fourth and fifth claims for relief against

---

**6.** Apart from any claims the estate may have, to the extent that the Noteholder's held actionable claims based on Morgan Stanley's conduct, they could have pursued those claims against Morgan Stanley directly in the appropriate forum.

Morgan Stanley and, therefore, those claims are dismissed.

### The Sixth Claim for Relief

In the final claim for relief, the Committee seeks to recoup from any amounts owed to MSSF, anything that Morgan Stanley or MSSF owe the Debtor based on the other claims for relief asserted against the Defendants. As the Court has dismissed the other claims for relief against the Defendants, there is no basis upon which to assert the defense of recoupment. Therefore, the sixth claim for relief is dismissed.[7]

### CONCLUSION

The Court finds that the allegations in the Amended Complaint do not provide a basis to impute Morgan Stanley's purported inequitable conduct to the Lender's such as would warrant subordinating the Lender's claim pursuant to § 510(c). Nor are there allegations in the Amended Complaint that would provide a basis to find actionable inequitable conduct by the Lenders themselves. The first claim for relief is dismissed.[8]

The Court further finds that as there are no facts alleged in the Amended Complaint to support a finding that the Lenders had either actual or constructive knowledge that the Debtor was insolvent at the time of, or would be rendered insolvent by, the purchase of the Acquisitions, or that the Debtor was overpaying for the Acquisitions, there is no basis to warrant collapsing the several transactions for the purpose of finding any of the conveyances

to be fraudulent. Thus, the second claim for relief is dismissed.

The Court further finds that because the Creditors' Committee has not met the standards for obtaining the Court's approval to pursue any claim the estate may have against Morgan Stanley, the third, fourth and fifth claims for relief against Morgan Stanley are dismissed.

The Court further finds that, as the other claims for relief have been dismissed, there is no basis upon which to assert the defense of recoupment and the final claim for relief is dismissed.

Thus, the entire Amended Complaint is dismissed.

Counsel for the Lenders is to settle an order, consistent with this Memorandum Decision, on three (3) days' notice.

---

7. As this claim for relief is dismissed because there is nothing to recoup, the Court does not reach the issue as to whether recoupment, which is essentially a defense to a claim, may be asserted as an affirmative claim for relief in an adversary proceeding. Nor does the

Court reach the substantive merits of a recoupment defense under the facts of this case.

8. In light of the Court's ruling, it is not necessary to address the Committee's request that the guaranties given by the Debtor's subsidiaries be disallowed.