**In re TICKETPLANET.COM, Debtor.**

**Angela Tese-Milner, as Chapter 7 Trustee of Ticketplanet.com, Plaintiff,**

**v.**

**TPAC, LLC, Sky Capital, Ltd., Sky Capital Holdings, Ross H. Mandell, Michael Passaro, Michael Recca, Golub & Golub, LLC, Zeigler Zeigler & Altman, John Does 1 and 2, Defendants.**

**Bankruptcy No. 01-15383(ALG).**
**Adversary No. 03-92508(ALG).**

United States Bankruptcy Court, S.D. New York.

June 10, 2004.

Tese & Milner, By Angela Tese–Milner, Esq., Michael M. Milner, Esq., New York, for the Plaintiff/Chapter 7 Trustee.

Wilmer, Cutler & Pickering, Michael Passaro and Michael Recca, By Andrew Goldman, Esq., New York, for Defendants Ross H. Mandell.

Nixon Peabody, LLP, By Douglas Spelfogel, Esq., Garden City, for TPAC, LLC, Sky Capital, Ltd., and Sky Capital Holdings.

Traub Eglin Lieberman Straus, By Lisa L. Shrewsberry, Esq., Hawthorne, for Defendant Golub & Golub, LLP.

Zeigler Zeigler & Associates LLP, By Scott A. Zeigler, Esq., New York, for Zeigler Zeigler & Altman LLP.

*MEMORANDUM OF DECISION*

ALLAN L. GROPPER, Bankruptcy Judge.

The Chapter 7 Trustee of the Debtor, Ticketplanet.com, Inc. has filed an adversary proceeding against ten defendants, alleging that the defendants perpetrated a fraudulent scheme to deplete the Debtor's estate for their benefit and avoid responsibility for its liabilities. The Amended Complaint ("Complaint") is in thirteen counts and sets forth the following claims for relief: (1) fraud; (2) breach of fiduciary duty and aiding and abetting breach of fiduciary duty resulting in a fraud upon the Court; (3) equitable subordination; (4) turnover of estate property; (5) recovery of administrative debt; (6) preferential transfer; (7) fraudulent conveyance; (8) fraudulent conveyance; (9) fraud and constructive trust; (10) conversion; (11) alter ego/piercing the corporate veil; (12) breach of fiduciary duty; and (13) disallowance of claim.

The Court has before it for decision three separate motions for dismissal of the Complaint filed by the following defendants: (i) Ross H. Mandell ("Mandell"), Michael Recca ("Recca") and Michael Passaro ("Passaro") (who alternatively seek summary judgment dismissing the case); (ii) TPAC, LLC, Sky Capital Holdings, Sky Capital Ltd. (who also seek summary judgment); and (iii) Golub & Golub, LLC. One additional defendant, Zeigler Zeigler & Altman, has not filed a motion.

The motions are disposed of as follows.

*FACTS*

***The Facts as Alleged in the Complaint***

The following facts are alleged in the Complaint and are assumed to be true for purposes of the motions to dismiss.

The Debtor was an internet-based travel agency for several years prior to its bankruptcy filing on October 18, 2001, and was controlled by Defendant Ross H. Mandell ("Mandell") its largest shareholder, who held at least 40% of its stock. (Complaint, ¶ 12.) Defendant Michael Recca ("Recca"), who was also a director of the Debtor, was also a control person. The Complaint asserts that Recca hired Michael Passaro ("Passaro") to act as the Debtor's president for the purpose of the bankruptcy filing and that Passaro, who had no knowledge of the Debtor's operations, was merely a figurehead designed to create the illusion of independent management and to obfuscate the control exercised by Mandell and Recca. (Complaint, ¶¶ 16 & 23–24.)

Prior to filing for Chapter 11 protection, the Debtor entered into a series of loan agreements with an entity called TPAC, LLC.[1] TPAC is owned and controlled by

1. According to TPAC the loans were the following: (i) a first loan, on or about April 12, 2001, in the amount of $250,000; (ii) a second loan, on June 5, 2001, in the amount of $100,000; and (iii) a third loan, less than three weeks later, in the amount of $50,000. On September 21, 2001, TPAC's loans to the Debtor were consolidated into a single promissory note dated July 30, 2001 in the principal amount of $502,000 (which meant an additional $102,000 was loaned). The Consolidated Note was modified by an agreement dated October 2, 2001 to correct an error and reflect that the principal due from the Debtor to TPAC was actually $419,500.51 and that accrued interest and fees under the previous notes was $270,000, for a total indebtedness of $669,500.51. (See TPAC's Statement of Facts ¶¶, 8, 14, 15 & 19.) ($419,500.51 and the alleged interest amount of $270,000 total $689,500.51, not $669,500.51.) The loan agreements provided that in addition to interest on the advances, TPAC would receive an equity interest in the Debtor and seat(s) on

Mandell and, according to the Complaint, was formed to advance funds to the Debtor and obtain a security interest in substantially all of the Debtor's assets.[2] (Complaint, ¶¶ 4, 11.) As a result of the TPAC loans, at the time of the filing, TPAC claimed a first priority security interest in substantially all of the Debtor's assets.[3]

The Complaint alleges that after the Debtor fell into financial difficulties Defendants Mandell, Recca, and TPAC engineered a scheme to defraud the Debtor's estate and creditors, and committed fraud upon the Court by, *inter alia*, failing to disclose the true relationship and intertwined nature of Mandell, Recca, TPAC and Sky in both the Debtor's bankruptcy petition and in a motion by TPAC to terminate the automatic stay of § 362 of the Bankruptcy Code and foreclose on its collateral (the "Lift Stay Motion"). The Complaint further alleges that the other Defendants, Passaro, Golub & Golub as attorneys for the Debtor, and Zeigler Zeigler & Altman as attorneys for Mandell and the prepetition Debtor, assisted in the fraudulent scheme.[4] In short, the Trustee charges that Mandell and Recca, by utilizing their positions of control of the Debtor and TPAC, were able to fraudulently seize the Debtor's assets while circumventing its liabilities in bankruptcy.

The scheme is alleged to have taken place at all relevant stages of this case: prepetition, post-petition and after the Court granted the Lift Stay Motion. The Complaint charges the Defendants with the following wrongful prepetition conduct. In Counts Six, Seven and Eight of the Complaint, the Trustee seeks to avoid two payments made by the Debtor from the TPAC loan proceeds: (i) a $25,000 advance on consulting fees paid by the Debtor to Sky; and (ii) a $50,000 prepetition payment to Zeigler Zeigler & Altman, whose legal fees as counsel to Mandell and the Debtor were passed along to the Debtor as borrower. (Complaint, ¶ 14.) The Trustee seeks the following specific relief:

*Count Six:* seeks to recover both payments directly from Sky and Zeigler Zeigler & Altman on the ground that the payments were voidable transfers. The Trustee argues that both parties were insiders of the Debtor and received such transfers within one year of the petition date. (Complaint, ¶¶ 46–49.)

the Debtor's Board of Directors. (Statement of Undisputed Material Facts of TPAC and Sky, ¶ 7.)

2. The sole secured creditor listed on the petition was TPAC, and it was listed as follows: "TPAC, LLC, c/o Sky Capital, Ltd., 99 Wall Street, 11th Floor, New York, N.Y. 10005, Ross H. Mandell, (212) 709–1901." The amount of the TPAC debt was listed as $700,000. (Petition, Schedule H.)

3. This included all of the Debtor's machinery and equipment, general intangibles, books and records, computer data, web sites, web pages and products. (Complaint, ¶ 13.) The Trustee also alleges that these defendants conspired with Sky Capital, Ltd., another entity also owned, managed and controlled by Mandell, which allegedly acted as a "finder" or broker in connection with the loans to the Debtor and received $25,000 of the proceeds of the TPAC loans. It is also alleged that Sky Capital, Ltd. is a successor in interest to Sky Capital Holdings. For the sake of simplicity, the Court will refer to the entities as "Sky."

4. The Complaint also names John Does 1 and 2 as additional defendants, claiming that they are "unknown entities and/or successors and/or affiliates of Sky or any unknown entity that may have received assets of the Debtor." (Complaint, ¶ 9.) No cause is shown to permit a John Doe filing, which is generally disfavored in the federal courts. See 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1659, at 451–52 (2004).

*Counts Seven and Eight:* seeks to recover both payments as fraudulent transfers from all Defendants (except Golub & Golub) on the grounds that the transfers were made for insufficient consideration at a time when the Debtor was insolvent.

The Trustee alleges that a large part of the Defendants' fraudulent scheme occurred during the Chapter 11 period and that the Defendants intentionally concealed the true relationship of Mandell, Recca, TPAC and Sky, from creditors and the Court.[5] As evidence of the "true relationship" between the parties, the Trustee quotes the following passages from Sky's Offering Memorandum in connection with the sale of membership interests in TPAC: (Complaint, ¶ 17.)

> "Ross Mandell, TicketPlanet's [the Debtor's] principal shareholder beneficially owns 43% of the outstanding shares of TicketPlanet's Common Stock ... which among other things, will allow him to exercise significant influence over the direction of TicketPlanet." Offering Memorandum at 23.
>
> "TPAC has been recently formed for the primary purpose of investing in financing and other opportunities, including, without limitation, providing debt and/or equity financing to TicketPlanet ... Sky presently is the sole member and sole Manager of the Company, and owns a total of 2,500 Units of voting Membership Interests of the Company...." Offering Memorandum at 25.
>
> "As of March 31, 2001, TicketPlanet had current tangible assets of approximately $380,000 and current liabilities of approximately $1.6 million. TicketPlanet is effectively insolvent and its financial resources are presently insufficient...." Offering Memorandum at 12.
>
> "Ross H. Mandell is...the controlling stockholder of Sky ... Mandell, both directly and through Sky, is a principal stockholder of TicketPlanet...." Offering Memorandum at 27.

The Trustee alleges that Defendants Mandell and Recca manipulated the Debtor's Chapter 11 case for their own benefit. The scheme allegedly involved the failure of the petition to adequately disclose the relationship between Mandell, Recca, the Debtor and TPAC. It included the Lift Stay Motion dated December 26, 2001, whereby TPAC moved to foreclose on the loans and its security interest and petitioned the Court for an order terminating the automatic stay. (Complaint, ¶ 13.) As part of its scheme, it is alleged that Recca directed Debtor's counsel not to object to the Lift Stay Motion.[6] (Complaint, ¶ 16.)

5. Among the specific acts of deception complained of by the Trustee are: (i) failure to reveal the identity of the ownership and management of the Debtor, TPAC, Sky, Mandell and Recca; (ii) failure to reveal that the Debtor was the subject of a consumer fraud lawsuit and investigation in California and that Mandell and Recca were served in that lawsuit as principals and representatives of the Debtor; (iii) failure to reveal that Mandell opened bank accounts and credit accounts in the Debtor's name and was a signatory on the Debtor's bank and credit card accounts; (iv) failure to reveal that Michael Passaro had no knowledge of the Debtor's operations and was hired by Recca to act as a front-man in connection with the bankruptcy filing. (Complaint, ¶ 23.)

6. The Lift Stay Motion was heard on January 9, 2002 and January 15, 2002, and an order providing that TPAC would be granted relief was entered—without objection by any party—on February 6, 2002. (Complaint, ¶ 13.) At the time there was also pending a motion by the U.S. Trustee to convert the case. It is alleged that the Debtor was instructed to object to the motion to convert the case. As further discussed below, the Court entered an order converting the case on January 15, 2002 at the same time the Lift Stay Motion was granted. Angela Tese–Milner was duly appointed as Chapter 7 Trustee of this case on

The Trustee asserts the following specific claims for conduct taking place during the post-petition period:

*Count One:* asserts a claim against all Defendants for fraud in connection with the alleged scheme and misconduct in this case.

*Count Two:* asserts a claim against Mandell, Recca and Golub & Golub for breach of fiduciary duty and against Passaro for aiding and abetting a breach of fiduciary duty, resulting in a fraud upon the Court.

*Count Three:* asserts a claim to have the Court equitably subordinate the claims of TPAC and Sky.

*Count Nine:* asserts a claim that the Debtor's property that was transferred to TPAC is subject to a constructive trust.

*Count Ten:* asserts a claim against all Defendants for conversion of the Debtor's property.

*Count Eleven:* asserts a claim to recover the Debtor's liabilities from Mandell and Recca on alter ego grounds.

*Count Twelve:* asserts a claim against Golub & Golub for breach of fiduciary duty to creditors and the estate and seeks disgorgement of all fees received (approximately $15,000).

*Count Thirteen:* seeks to disallow TPAC's and Sky's claims on the ground that the funds advanced by TPAC were contributions to capital and not loans.

Finally, the Trustee alleges the Defendants continued their fraudulent scheme following the granting of the Lift Stay Motion. It is alleged that TPAC, by Mandell and Recca, conducted a sham auction sale of the Debtor's assets, including certain software, a booking engine and computer equipment. The Trustee argues that TPAC should have, but did not, seek an order of foreclosure in State Court and that neither the creditors of the Debtor nor the Trustee were notified in advance of the auction. (Complaint, ¶¶ 19–21.) As a result, TPAC was the only bidder at the auction and gained control of the Debtor's assets, which were valued at one point in excess of one million dollars, by credit bidding only a small portion of its debt. The Trustee seeks the following relief for conduct taking place after the Lift Stay Motion:

*Count Four:* seeks an accounting and turnover of estate property from TPAC, Mandell and Recca.

*Count Five:* seeks to hold all Defendants liable for post-petition administrative expenses in excess of $50,000, including taxes of $35,000. The Trustee alleges these monies are due because the Defendants continued to collect receivables but did not pay the appropriate taxes.

As noted above, the Defendants who filed motions to dismiss have also filed for summary judgment (except for Golub & Golub), and they paint a much different picture. They argue that the TPAC loans were an attempt to save the Debtor, which was in poor financial condition and effectively insolvent. They further argue that the relationship among the relevant parties was properly disclosed in both the bankruptcy petition and the Lift Stay Motion. The events of this case were not a result of a fraudulent scheme, it is argued, but rather a reasonable response to a series of business setbacks which included: (i) prepetition management embezzling funds

an interim basis on January 16, 2002 and on a final basis on March 15, 2002. As the Order converting the case from Chapter 11 to Chapter 7 indicates, both the Debtor and TPAC supported dismissal, but opposed conversion. See Order Converting Chapter 11 Case to a Case Under Chapter 7, dated January 15, 2002.

and being fired, resulting in a need to bring in new managers; (ii) the fired managers establishing a business to compete against the Debtor; and (iii) the general fallout in the travel industry following September 11, 2001.

## *DISCUSSION*

The Defendants have sought dismissal as to all counts for failure to state a claim upon which relief can be granted. Alternatively, they seek dismissal on the ground that the Complaint does not allege fraud, and all claims having to do with fraud, with the specificity required by Bankruptcy Rule 7009(b), incorporating Rule 9(b) of the Federal Rules of Civil Procedure. As noted, Mandell, Recca and Passaro and TPAC and Sky also seek summary judgment as to all counts.

*The Standards for Decision*

A complaint may not be dismissed under Federal Rule of Civil Procedure 12(b)(6), incorporated herein by Bankruptcy Rule 7012(b)(6), unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Upon consideration of the allegations contained in the complaint, including any exhibits attached thereto, the Court is obligated to accept all of the allegations in the complaint as true and to draw all reasonable inferences in favor of the plaintiff. *Stuto v. Fleishman,* 164 F.3d 820, 824 (2d Cir.1999). The scope of the court's review is limited, as the "[i]ssue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). In order to survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999).

The standards for determining a motion for summary judgment are the following. Pursuant to Rule 56(c), incorporated by Bankruptcy Rule 7056(c), summary judgment should be granted to the moving party if the Court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting F.R.C.P. 56(c)). The mere existence of disputed facts will not preclude entry of summary judgment. Rather, only disputes over facts that may affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A movant has the initial burden of establishing the absence of any genuine issue of material fact. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. That burden can be satisfied by demonstrating the absence of evidence to support the non-movant's case. *Id.* at 325, 106 S.Ct. 2548. Once the moving party has met its burden, its opponent must do more than simply show there is some metaphysical doubt as to these material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*Count One: The Fraud Claim*

Under New York law, which both parties have cited as applicable on this

claim, the elements of a fraud count are: (i) a misrepresentation of an existing material fact; (ii) knowingly or recklessly made by one party to another; (iii) with the intent to deceive; (iv) which misrepresentation is justifiably relied upon; (v) to the detriment of the party relying on it. *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir.1987); *In re Embers 86th Street, Inc.*, 184 B.R. 892, 898 (Bankr.S.D.N.Y.1995).

The Trustee alleges that the Defendants engaged in a systematic scheme to defraud the estate and its creditors, and knowingly made misrepresentations in connection with the Debtor's bankruptcy petition and the Lift Stay Motion. It is alleged that the Defendants concealed their control over the Debtor, the fact that they also controlled the alleged lender, TPAC, and the fact that they used the Chapter 11 case as a means to foreclose on the TPAC lien and prevent the Debtor's other creditors from obtaining any recovery. The Defendants contend that the fraud claim is insufficient for three reasons. First, they argue the claim has not been pleaded with particularity, as required by Bankruptcy Rule 7009(b), incorporating Federal Rule of Civil Procedure 9(b). Second, the Defendants assert, the claim should be dismissed on collateral estoppel grounds, because the issue of adequate disclosure was previously raised and litigated in prior proceedings before the Court. Third, they argue that even if the claim has been properly pleaded, the connections between the parties were disclosed in both the Chapter 11 petition and the Lift Stay Motion, and the Trustee has failed to provide any factual basis that would permit the fraud claim to withstand summary judgment.

*Fraud Claim Not Pleaded With Particularity*

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." To pass muster under Rule 9(b) "a complaint must allege with some specificity the acts constituting fraud ... conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.*, 85 F.Supp.2d 282, 293 (S.D.N.Y.2000), quoting *Lobatto v. Berney*, 1999 WL 672994, at *9 (S.D.N.Y. Aug.26, 1999). This is particularly true where fraud is alleged against multiple defendants. As the court said in *Ellison v. Am. Image Motor Co., Inc.*, 36 F.Supp.2d 628, 640 (S.D.N.Y.1999), "when fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant."

The Complaint contains many allegations of false representations made by the Defendants. It avers a general scheme by the Defendants to defraud the estate and its creditors through a failure to disclose the true relationship of all the parties. It further alleges that the auction of the Debtor's assets was a sham, and there are other allegations regarding collusion between the parties, including that the Debtor's counsel was ordered not to object to the Lift Stay Motion. But there has been inadequate pleading of at least two elements necessary to pursue a fraud claim: misrepresentation of an existing fact and reliance.

The Court can on a motion to dismiss take judicial notice of the pleadings and hearings in this case. See *In re Lois/USA, Inc.*, 264 B.R. 69, 89 (Bankr. S.D.N.Y.2001), citing *In re Granite Partners, L.P.*, 210 B.R. 508, 510 (Bankr. S.D.N.Y.1997). It is thus a matter of record that there was disclosure in the petition of Mandell's involvement with TPAC, as he was designated as the responsible

representative of TPAC in the Debtor's initial filing. More important, by the time of the hearing on the Lift Stay Motion, a creditors committee had been appointed, had discovered the basic facts relative to the relationship between the Debtor and TPAC, and had brought these to the attention of the Court. See Tr. of the Lift Stay Motion Hearing, January 9, 2002, pp. 13–18. The foregoing does not insulate the defendants from all liability, as further discussed below. But it does point up a glaring omission in the Complaint—that there was a material misrepresentation by the defendants that was relied on. The existence of a material misrepresentation or failure to disclose and reliance are essential elements of any fraud claim, and the Trustee has not alleged them adequately. In the absence of the necessary elements of pleading, Count One must be dismissed on the ground that fraud has not been pleaded with the particularity contemplated by Rule 9(b).

*Claim Not Dismissed on Collateral Estoppel Grounds*

The Defendants also argue that the fraud claim should be dismissed on collateral estoppel grounds because the Trustee is seeking to relitigate charges of nondisclosure that were already fully and fairly litigated at the Lift Say Motion Hearing and at least two subsequent hearings including the hearings regarding the Trustee's motions to: (i) designate Mandell and Recca as the Debtor's responsible parties; and (ii) the Trustee's motion to amend the Lift Stay Order to permit her to hold certain deposit funds she received from a fiduciary account at Trans Pacific Bank. This argument is entirely specious.

The doctrine of collateral estoppel precludes a party from relitigating in a subsequent proceeding an issue of law or fact that has already been decided in a prior proceeding. Under Federal law, a party is collaterally estopped from relitigating an issue if: (1) the identical issue was raised in a previous proceeding; (2) the issue was "actually litigated and decided" in the previous proceeding; (3) the party has had a "full and fair opportunity" to litigate the issue; and (4) the resolution of the issue was "necessary to support a valid and final judgment on the merits." *Boguslavsky v. Kaplan*, 159 F.3d 715, 719–720 (2d Cir.1998), citing *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir.1997). On the other hand, an issue that has been decided in the *same* case does not collaterally estop a party from raising the issue again; but the prior determination is merely law of the case. *Arizona v. California*, 460 U.S. 605, 618–19, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). Under this doctrine, a decision on an issue of law made at one stage of the case becomes a binding precedent to be followed in subsequent stages of the same litigation. *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir.1991). The doctrine does not, however, preclude a court from reversing what has been done; it "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912).[7] Under no circumstances does collateral estoppel bar the Court from considering the fraud claims.

In any event, the Court's prior disposition of the motions relied on by Defen-

7. The principal grounds for justifying reconsideration are: (i) new evidence; (ii) an intervening change of controlling law; or (iii) clear error or manifest injustice. See *DiLaura v. Power Authority of the State of New York*, 982 F.2d 73, 76 (2d Cir.1992); see also, 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4478, at 671–73 (2002).

dants made it clear that there could be no estoppel as to any subsequent claims that might be brought charging wrongdoing. At the Lift Stay Motion Hearing, the Court expressly stated that relief from the automatic stay would not bar any subsequent charges of wrongdoing. As noted above, the Court converted the case at the same time it granted the Lift Stay Motion. It specifically stated, "Let them [TPAC] dispose of the collateral, perhaps reduce their claim and if there are any actions against the lender, which was you say was also a major shareholder of a .com company, then that is all reserved to the trustee." See Tr. of the Lift Stay Motion Hearing, January 9, 2002, p. 17. It is commonplace to sever issues regarding lender liability or misconduct to later decision when a court decides a motion for relief from the stay, which by statute must ordinarily be determined within a 30-day period. See 11 U.S.C. § 362(e); see also *In re Adbrite Corp.*, 290 B.R. 209, 221 (Bankr.S.D.N.Y.2003). Moreover, the Order Modifying and Terminating the Automatic Stay indicated that TPAC was to preserve the Debtor's books and records and provide the Trustee reasonable access to such documents, for review and copying.[8]

The winding trail of litigation that followed the Lift Stay Motion and resulted in the other two orders cited by Defendants leaves no doubt that all claims were reserved to the Trustee. The Trustee filed a motion to designate Mandell and Recca as the Debtor's responsible parties. While that motion was ultimately denied, the corresponding order entered by the Court provided that: (i) the Trustee had the right to view the Debtor's books and records; (ii) TPAC, Mandell and Recca were to preserve, maintain and remain accountable for Debtor's books and records, including data stored on the Debtor's computers; (iii) the Trustee was authorized to serve an appropriate application on Zeigler Zeigler & Altman for turnover of the Debtor's files and other documents referring to the Debtor, and (iv) the Trustee was authorized to file an application for discovery pursuant to Fed. R. Bankr.Proc. 2004.[9] Notably, TPAC—not the Trustee—proposed that the Trustee be given access to the Debtor's books and records and serve Bankruptcy Rule 2004 applications and orders upon TPAC, Mandell and Recca as a way to resolve the motion. (Statement of Undisputed Material Facts of TPAC and Sky, ¶ 33.) Some time thereafter, the Trustee made a motion seeking Bankruptcy Rule 2004 discovery, which the Court granted, to compel the depositions of Mandell, Recca, Passaro and others, as well as the production of documents. With regard to the Trustee's Motion to Amend the Lift Stay Order, the corresponding order entered by the Court provided that the Order was without prejudice to the Trustee and TPAC to seek further relief, including "an ultimate determination as to the rights of TPAC in the assets of the Debtor collected and to be collected."[10]

The record on this score, which includes the Court's specific remarks made at the Lift Stay Hearing in addition to an extensive paper trail thereafter, could not be any clearer—all claims of potential wrongdoing were reserved to the Trustee.

**8.** See Order Modifying and Terminating the Automatic Stay, dated February 6, 2002.

**9.** See Order Resolving Order to Show Cause By Trustee Seeking Designation of Responsible Officers and Production of Debtor's Books and Records, dated March 20, 2002.

**10.** See Order Granting Trustee's Motion, Authorizing Trustee to Collect and Hold Debtor's Assets and Directing Accounting, dated June 18, 2002.

*Summary Judgment on Fraud Claim*

To sum up, Count One is dismissed for failure to allege fraud adequately, not on collateral estoppel grounds. The Defendants' motion for summary judgment on the fraud claim need not be reached.

*Count Two—Breach of Fiduciary Duty, Aiding and Abetting a Breach of Fiduciary Duty; Fraud Upon the Court*

The Court considers this count as containing at least two separate claims, which are discussed in turn.

*Breach of Fiduciary Duty*

This claim essentially alleges that Mandell, Recca and Golub & Golub, through the alleged scheme to defraud, also breached their fiduciary duty to the Debtor. Neither Mandell, as the controlling shareholder of the Debtor, nor Recca, as a member of the Debtor's Board of Directors, has seriously argued that he did not have a fiduciary duty to the Debtor. Golub & Golub admits it had a fiduciary duty to the Debtor. (See Golub & Golub Memorandum, p. 5.) The Defendants, nevertheless, argue that the Trustee has not properly pleaded this claim in accordance with Rule 9(b).

The Trustee's claim for breach of fiduciary duty is governed by Delaware law, which is the state of the Debtor's incorporation. Bankruptcy courts generally apply the choice of law rules of the state in which they sit. *In re Crazy Eddie, Inc.*, 1992 WL 406543, *12 (Bankr.S.D.N.Y. Dec.17, 1992). Under New York law, the law of the state of incorporation governs an allegation of breach of fiduciary owed to a corporation. *Diamond v. Oreamuno,* 24 N.Y.2d 494, 503–04, 301 N.Y.S.2d 78, 248 N.E.2d 910 (N.Y.1969). Delaware law accordingly governs this claim.

The fiduciary duties of directors of a corporation include the duty of care and the duty of loyalty. *Norlin Corp. v. Rooney, Pace, Inc.*, 744 F.2d 255, 264 (2d Cir.1984). The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his or her tasks, the care that a reasonably prudent person would use under similar circumstances. The second prong, the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship. *Id.*, citing *Pepper v. Litton,* 308 U.S. 295, 306–07, 60 S.Ct. 238, 84 L.Ed. 281 (1939). Under Delaware law, to establish a breach of fiduciary duty, a plaintiff must overcome the business judgment rule, which provides that in making business decisions, there is a presumption that the disinterested directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984); *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1246 (Del. 1999); *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985). But this presumption only applies when the director is disinterested.

The Delaware Supreme Court has defined "interest" under a business judgment rule analysis as meaning "that directors can neither appear on both sides of a transaction nor expect to derive any personal benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." See *Aronson v. Lewis,* 473 A.2d at 812. A disenabling benefit must be material, which means that it must be significant enough "in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties ... without being influenced by her overriding personal interest." *Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch.2002). If a plaintiff successfully demonstrates facts

sufficient to rebut the business judgment rule, then the burden of proof shifts to the defendant director or directors to establish the "fairness" of the challenged transaction or that some informed and neutral decision-making body approved the transaction. See *Kahn v. Lynch Comm. Sys., Inc.,* 638 A.2d 1110, 1115 (Del.1994); see also, *Oberly v. Kirby,* 592 A.2d 445, 467 (Del.1991).

In the instant case, the Trustee's allegations appear to charge defendant Mandell and Recca with breach of the duty of loyalty and Passaro with aiding and abetting in the breach of fiduciary duty. The Trustee charges that their actions both before and after the Chapter 11 filing were taken to protect themselves and benefit TPAC and its affiliates rather than the Debtor and its creditors. Their actions included a failure to adequately disclose Mandell's competing interest, the appointment of a straw-man at the helm of the Debtor, their direction to the Debtor's counsel not to fight the Lift Stay Motion, and their efforts to engineer a dismissal of the initial Chapter 11 case rather than a conversion once TPAC had taken control of the Debtor's assets.

As the Court observed at the time of the Lift Stay Motion when it was informed about the relationship between Mandell and TPAC, it is not uncommon for a lender to take a seat on the Board of its borrower. Indeed, this practice appears common where the lender is a venture capital firm and the borrower is a start-up operation, and counsel painted the relationship between this Debtor and TPAC in that guise. See Tr. Hearing of the Lift Stay Motion Hearing, January 9, 2002, pp. 23–24. Allegations that a lender has a seat on the debtor's Board of Directors are insufficient, standing alone, to state a claim for relief in a breach of fiduciary duty suit under Delaware law. See *In re Submicron Sys. Corp.,* 291 B.R. 314, 325 (D.Del. 2003).

The allegations here are of a different magnitude. The allegations are that the lender, acting through two directors of the Debtor, placed a straw-man in charge of the Debtor and directed the Debtor and its counsel to "take a dive" on the Lift Stay Motion. It is noteworthy that, in their motion for summary judgment on this claim, defendants Mandell and Recca claim that the Board of TPAC was left in a precarious position when the prior management absconded with much of the Debtor's assets. These defendants refer to other, possibly independent Board members but make no serious showing that there was any effort to segregate the Debtor's interest from TPAC's interest and make certain the Debtor had independent representation. Nor is there any showing that the allegedly independent directors took any action whatsoever during this critical period in the company's existence. Based upon the record on these motions, defendants Mandell and Recca are not entitled to dismissal or summary judgment on the breach of fiduciary duty claims against them.

The result is different for Golub & Golub and Passaro. An actor is liable for harm resulting from the tortious conduct of another if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other. *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 181, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Under Delaware law, to survive a motion to dismiss a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must plead facts indicating: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; and (3) a knowing participation in that breach. *In re Santa Fe Pacific Corp.*

*Shareholder Litigation,* 669 A.2d 59, 72 (Del.1995). A conclusory statement, in the absence of facts from which one can infer knowing participation in a breach of duty, will not suffice. *Id.* As to Golub & Golub, as attorneys for the Debtor, they owed a fiduciary duty to the estate. But there are no allegations that they acted independently to breach any duty, that they had specific knowledge of the alleged breach of duty by any director, or that they did not have reason to follow the directions of their client. Under such circumstances, the allegations of the complaint are insufficient to state a claim against the law firm, whether stated as an aiding and abetting claim or otherwise, and they are dismissed.[11]

The claim against Passaro is also dismissed. The Trustee alleges that Passaro assisted Mandell and Recca. But Passaro was not a director of the Debtor and by the Trustee's own allegation was not versed in the Debtor's business. In any event, the Trustee makes no specific allegations as to Passaro's involvement in the alleged scheme or his knowledge thereof, and the allegations are not sufficient to withstand a motion to dismiss. The aiding and abetting claim against Passaro is accordingly dismissed.

*Fraud Upon the Court*

"Fraud on the court" encompasses conduct that prevents the court from fulfilling its duty of impartially deciding cases. *In re Clinton Street Food Corp.,* 254 B.R. 523, 532 (Bankr.S.D.N.Y.2000). It involves conduct that "seriously affects the integrity of the normal process of adjudication," and is available "only to prevent a grave miscarriage of justice." *Id.,* citing *Lehman Brothers, Inc. v. Masselli,* 1998 WL 531831, *6 (S.D.N.Y. Aug.24, 1998), quoting *United States v. Beggerly,* 524 U.S. 38, 47, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998).

The Trustee argues that the conduct of Mandell, Recca and Golub & Golub amounted to a "fraud upon the court." Mandell, Recca and Golub & Golub in turn argue that since there was no fraud, there can be no claim for "fraud upon the court."

Both parties cite *In re Clinton Street Food Corp.,* 254 B.R. 523 (Bankr.S.D.N.Y. 2000), which involved an allegation by a Chapter 7 trustee that several parties "rigged" an auction of the debtor's property. The defendants included the purchasers of the assets, and three potential competing bidders, and it was alleged that the potential bidders were paid by a representative of the ultimate purchaser to refrain from bidding for the debtor's assets. As a result, there were no other bids, and the purchaser's $320,000 bid for at least $2,000,000 in assets was accepted. In response to the motion to dismiss, the court examined four elements of a "fraud upon the court" claim, as set forth in *Leber–Krebs, Inc. v. Capitol Records,* 779 F.2d 895 (2d Cir.1985):(1) the defendant's misrepresentation to the court; (2) the impact on the motion as a consequence of that misrepresentation; (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and (4) the benefit the defendants derived by inducing the erroneous decision. The court found that the trustee had stated a cognizable claim for "fraud upon the court" on the basis of the allegations that the defendants lied when the bankruptcy court inquired whether there were any bidding agreements, that the lie contributed to the acceptance of the purchaser's bid and approval of the court's

11. Count Twelve of the Complaint alleged a breach of fiduciary duty claim against Golub & Golub and disgorgement of $15,000 in fees, and is also dismissed.

sale order, that the trustee lacked the opportunity to discover the fraud in light of the summary nature of the sale proceeding, and that the defendants benefited.

The allegations in this case, however, are very different. The Trustee alleges that the Defendants engaged in a fraudulent scheme and misrepresented the facts. But unlike *Clinton Street Food Corp.*, the alleged misrepresentations did not substantially impact the Court's ruling at the Lift Stay hearing, as the essential facts regarding the relationship between Mandell, Recca, the Debtor and TPAC were known—which is precisely the reason the Court reserved all rights to the Trustee to investigate any potential claims arising from that relationship. Taking all of the allegations in the Trustee's favor, the Complaint does not adequately state a claim for "fraud upon the court" necessary to prevent a grave miscarriage of justice. This claim is accordingly dismissed.

*Count Three—Equitable Subordination*

The third Count charges that the claims of TPAC and Sky should be equitably subordinated. Under the doctrine of equitable subordination a bankruptcy court may subordinate a claim or divest a secured creditor of its interest in collateral, if it finds that the creditor's claim, while not necessarily lacking a lawful basis, nonetheless results from inequitable behavior on the part of that creditor. *Kelleran v. Andrijevic,* 825 F.2d 692, 697 (2d Cir.1987). The Code does not set forth the "principles of equitable subordination." Rather, Congress intended that case law would establish the framework for its development. *In re Sunbeam, Corp.*, 284 B.R. 355, 363 (Bankr.S.D.N.Y.2002).

In determining whether a claim should be equitably subordinated, many courts have applied the three-prong test set forth in *In re Mobile Steel Co.:* (i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors ... or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy law. See *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 700 (5th Cir.1977), cited with approval in *United States v. Noland,* 517 U.S. 535, 538, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). See also, *New Jersey Steel Corporation v. The Bank of New York,* 1997 WL 716911 (S.D.N.Y. Nov.17, 1997); *In re Lois/USA, Inc.*, 264 B.R. 69, 132–33 (Bankr.S.D.N.Y.2001). Inequitable conduct encompasses conduct which may be lawful, but nevertheless shocks one's conscience, and it includes a secret or open fraud; lack of good faith by a fiduciary; unjust enrichment, or enrichment brought about by unconscionable, unjust, unfair, close or double dealing or foul conduct. *In re Lois/USA,* 264 B.R. at 134; *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 563 (Bankr.S.D.N.Y.2002). The type of misconduct that warrants equitable subordination of a claim includes: (i) fraud, illegality or breach of fiduciary duty; (ii) undercapitalization of the debtor; and (iii) the control or use of the debtor as an alter ego for the benefit of the claimant. *In re Granite Partners, L.P.,* 210 B.R. 508, 514 (Bankr. S.D.N.Y.1997); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),* 169 B.R. 832, 838 (Bankr. S.D.N.Y.1994).

TPAC and Sky argue that this claim must be dismissed on the ground that it is not adequately pleaded. Taking the allegations as true for purposes of the motions to dismiss, there is no question that the allegations in the Complaint sufficiently plead a claim for equitable subordination and that the Trustee has pleaded facts satisfying the three-prong test of *Mo-*

*bile Steel.* Nor have the Defendants met their burden on a summary judgment motion. The facts of record and the allegations of the Complaint sufficiently allege that the Defendants used their power to achieve an improper advantage over other creditors, and that the Trustee's allegations, if proved, would entitle her to relief, including stripping TPAC of its collateral. See 11 U.S.C. § 510(c)(2). As for the inequitable conduct, it is claimed that TPAC and Sky, through Mandell and Recca, concocted a scheme to defraud the Debtor's estate and creditors and failed adequately to disclose the control that Mandell, Recca, TPAC and Sky had over both the Debtor's bankruptcy petition and the Lift Stay Motion.

The second and third prongs of the *Mobile Street* test are not significant hurdles for the Trustee to overcome. The Court can conclude, at this stage of the case, that TPAC and Sky were given an unfair advantage over the Debtor and its creditors. The extent of the damage and the appropriate remedy are not issues that can be decided at this stage of the case. Nor does the third prong of the *Mobile Steel* test, consistency with bankruptcy policy, undercut the Court's conclusion. Bankruptcy policy is not furthered where creditors are permitted to use inequitable means to further their recovery.[12]

Moreover, the Complaint also alleges that TPAC and Sky are "insiders" and that the Court must look at their dealings with the Debtor very closely.[13] Claims involving insiders "are subjected to rigorous scrutiny" and the burden is on the claimant "to prove the good faith of the transaction" and also "to show its inherent fairness from the viewpoint" of the debtor.[14] *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 564. In sum the third count will not be dismissed, and summary judgment is not appropriate on the present record.

*Count Four—Accounting and Turnover of Estate Property from TPAC, Mandell and Recca*

The Trustee in Count Four seeks an accounting and turnover of estate property pursuant to § 542(b) of the Bankruptcy Code, which states that turnover proceedings may be brought against "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order." 11 U.S.C. § 542(b). As to this claim, the Complaint states only that "Defendants should account for and turn over property of the estate," and that "TPAC has failed

12. Assuming the first two prongs of the *Mobile Steel* test are satisfied, this prong is of little significance. *Mobile Steel* was decided under the Bankruptcy Act, which did not specifically provide for equitable subordination. As one court has noted, "[S]ince the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination the third prong of the *Mobile Steel* test is likely to be moot." *In re 80 Nassau Assocs.*, 169 B.R. at 841 (citation omitted).

13. Insider is defined by the Bankruptcy Code § 101(31). That section provides that: ("[I]nsider" *includes*—(B) if the debtor is a corporation—(i) the director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor.)

14. There is no doubt that TPAC and Sky were "insiders" as defined in the Code, and they do not appear to argue to the contrary. The Court notes, however, that the statutory list of "insiders" is not exhaustive and courts may define the limits of a non-statutory insider by considering all the facts of a given case. See *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 564–65.

to account for the proceeds of the software and other assets." (Complaint, ¶¶ 41–42.) The Court is left to guess as to which property the Trustee specifically seeks, although there is an allegation the Defendants are improperly holding monies received from the sale of the Debtor's antique car.

Turnover proceedings apply to "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order." See 11 U.S.C. § 542(b). In order for a claim to be considered a matured debt, it must be specific in its terms as to amount due and date payable. *In re Shea & Gould,* 198 B.R. 861, 867 (Bankr.S.D.N.Y. 1996). Here, the Complaint does not even specify such a debt and, as discussed below, the Trustee has other means of challenging the auction sale of the Debtor's property. The Trustee might have a valid claim for turnover of the Debtor's antique car, or possibly of its proceeds, but any such claim can and should be brought in a simple, well-pleaded separate complaint. The Fourth Count is dismissed without prejudice.

*Count Five—Administrative Expenses Claim*

The Trustee, in this claim, seeks to hold all of the Defendants liable for post-petition administrative expenses in excess of $50,000, including taxes of $35,000. The Trustee alleges these monies are due because the Defendants (presumably TPAC) continued to collect receivables after the Lift Stay Motion was granted, but did not pay the appropriate administrative taxes. The Trustee cites no provision of the Code or other applicable law in referring to this claim, and the Court cannot even begin to assess the validity of this claim in the face of such piecemeal allegations. This claim is dismissed as to all Defendants, without prejudice.

*Claims Six, Seven & Eight: Fraudulent Conveyance Claims*

Pursuant to §§ 548 and 550 of the Bankruptcy Code, the Trustee seeks to recover two prepetition transfers made by the Debtor: (i) a $25,000 payment to Sky for consulting work; and (ii) a $50,000 payment to Zeigler Zeigler & Altman, counsel to Mandell and the Debtor. The Trustee alleges that transfers were fraudulent conveyances in that the Debtor made both payments within one year of the filing of the petition, at a time when the Debtor was insolvent, and that the payments were made for no consideration and in bad faith. The Trustee also alleges that the $25,000 was really a disguised financing payment. (Complaint, ¶ 18.) The Defendants argue that these claims should be dismissed because the Trustee has failed to plead them with particularity. They further allege, with respect to the $25,000 payment to Sky, such payment was made pursuant to an arm's length consulting agreement in the ordinary course of business.[15]

To establish a claim for a fraudulent transfer pursuant to § 548 of the Bankruptcy Code, the Trustee must establish that: (i) the Debtor had an interest in the property; (ii) a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (iii) the Debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (iv) the Debtor received less than a reasonably equivalent value in exchange for such

15. The Defendants argue that the Complaint does not specifically reference the transfers the Trustee seeks to avoid, and that the TPAC loans were not fraudulent transfers. To the extent the Complaint is vague, the Trustee's Reply Memorandum makes it clear that she seeks to avoid only the transfers described above—not the TPAC loans.

transfer. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

The Trustee has sufficiently alleged a claim for fraudulent transfer as to the $25,000 payment to Sky and the $50,000 payment to Zeigler Zeigler & Altman. The Debtor had an ownership interest in the monies it advanced to Sky and Zeigler Zeigler & Altman, which were paid within a year of the filing of the petition, and there are adequate allegations of insolvency.[16] The last element of the claim, that the Debtor received less than reasonably equivalent value in exchange for such value, is an open question on this record. But the Trustee has made the necessary allegations to withstand the motion to dismiss.

The Defendants state that the claim must be dismissed for failure to plead with particularity. While there is authority to the contrary, the better and majority rule is that a claim for constructive fraud under § 548(a)(1)(B) need not be pleaded with particularity, as the claim is not premised on fraud but on a transfer made for inadequate consideration at a time the transferor was insolvent. See *In re White Metal Rolling and Stamping Corp.*, 222 B.R. 417, 428–29 (Bankr. S.D.N.Y.1998); see also *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr. S.D.N.Y.1999) ("The pleading of constructive fraud, as opposed to actual fraud, must only comply with Rule 8(a) because *scienter* is not an element."); *China Resource Prods. (USA), Ltd. v. Fayda Int'l, Inc.*, 788 F.Supp. 815, 819 (D.Del.1992); *Hassett v. Weissman (In re O.P.M. Leasing Services, Inc.)*, 35 B.R. 854, 862 (Bankr.S.D.N.Y.1983), *rev'd on other grounds*, 48 B.R. 824 (S.D.N.Y.1985); *Allegaert v. Perot*, 78 F.R.D. 427, 430–31 (S.D.N.Y.1978). The Trustee has provided the Defendants with sufficient notice to prepare an answer, the opportunity to frame discovery and defend against the charges.

*Count Nine: The Constructive Trust Claim*

In Count Nine, the Trustee asserts that certain of the Debtor's property that was "transferred" should be held in a constructive trust. Under New York law, a constructive trust arises against an entity that, by fraud (actual or constructive), by duress or by abuse of confidence, or by commission of a wrong or other form of unconscionable conduct, artifice, concealment, or questionable means, either has obtained or holds the legal right to property which in equity and in good conscience it ought not to hold and enjoy. See *Simonds v. Simonds*, 45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978); *Equity Corp. v. Groves* 294 N.Y. 8, 60 N.E.2d 19 (1945).[17] A party claiming entitlement to a constructive trust must ordinarily establish the following: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *In re Koreag, Controle et Revision, S.A. v. Refco F/X Assoc., Inc. (In re Koreag)*, 961 F.2d 341, 352 (1992).

16. By the Defendants' own words, they sought to infuse capital into the Debtor because it was at a financial crossroads. The Sky Offering Memorandum also states that the Debtor was insolvent.

17. The New York Court of Appeals declared in *Simonds*, "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Simonds v. Simonds*, 45 N.Y.2d at 241, 408 N.Y.S.2d at 363, 380 N.E.2d at 193.

The allegations in the Complaint are insufficient to state a claim for imposing a constructive trust. It is impossible to be certain what property the Trustee is referring to. The Trustee has not alleged the necessary elements of reliance or unjust enrichment. In short, the Trustee has not adequately pleaded a claim for a constructive trust, and the claim is dismissed.

*Count Ten—Conversion of the Debtor's Property*

The Trustee seeks to pursue a claim for conversion against all Defendants. Under New York law, conversion is any unauthorized exercise of control by one who is not the owner which interferes with a superior possessory right of another in property. *In re Ames Department Stores, Inc.,* 274 B.R. 600, 629 (Bankr. S.D.N.Y.2002). To sustain a conversion claim, acts must be alleged that are unlawful or wrongful that are not a mere violation of contractual rights. *Fraser v. Doubleday & Company, Inc.,* 587 F.Supp. 1284, 1288 (S.D.N.Y.1984).

This count really contains two separate claims by the Trustee. The first claim challenges the foreclosure and the subsequent auction of TPAC's collateral and charges that the sale was not properly noticed and was a sham. But the actions of the Defendants were taken under color of a foreclosure, and TPAC was authorized to foreclose on the Debtor's property in the Lift Stay Order, and the Trustee does not allege that another party had a superior possessory right in such property. It may be that the sale was not properly noticed or that there was inequitable conduct at the auction. But there was no unauthorized possession, and the alleged acts do not amount to acts that constitute a conversion. See *In re Ames Department Stores, Inc.,* 274 B.R. at 629.

The Trustee may have a claim under applicable State law for failure to conduct a sale of property in a reasonable manner. The New York Uniform Commercial Code sets forth standards that must be followed and notification that must be given in a sale of personal property by a secured party. UCC § 9–610, *et seq.* Damages may be awarded for noncompliance, UCC § 9–625, and an action can be brought for relief under § 9–626. TPAC and Sky argue in their Reply Memorandum that the auction was properly noticed and not a sham. But at this stage of the case and on the current record, the Court cannot determine the propriety of the sale. If the auction was not conducted in accordance with applicable standards, the Trustee has her remedy, and leave is granted to the Trustee to plead a claim against the relevant parties for failure to conduct an appropriate foreclosure sale.

The Trustee is on stronger ground in alleging a claim for conversion with regard to the Debtor's vintage automobile. She alleges that TPAC, Sky, Mandell and Recca did not have a possessory interest in the car but sold it and pocketed the proceeds, which totaled about $13,000. The Defendants effectively fail to address the Trustee's allegations as to this claim, and the Court is satisfied that the Trustee has properly pleaded a claim for conversion as to the Debtor's car. Count Ten will not be dismissed but will be limited to conversion of the automobile.

*Claim Eleven—Alter Ego/Piercing the Corporate Veil*

According to the Complaint, Mandell and Recca, through TPAC and Sky, exercised a degree of control over the Debtor that caused the Debtor to be a mere instrumentality or alter ego of TPAC and Sky. The Trustee further charges that Mandell and Recca used their control to

commit wrongs that resulted in loss and injury to the Debtor and should be held personally responsible for the Debtor's liabilities. Mandell and Recca have moved to dismiss this claim, arguing that the Trustee has failed to plead facts, which, if established, would show that piercing the corporate veil is warranted and that even if the veil were pierced, they would not automatically become liable for all of the debts of the Debtor.

In determining whether the corporate form should be disregarded and a corporate veil pierced, the law of the state of incorporation is applied. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995); *Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 365 (Bankr.S.D.N.Y.2002). Since the Debtor is a Delaware corporation, Delaware law applies. Under Delaware law, courts can pierce the veil of a corporation "where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995). There is no requirement of fraud; to prove an alter ego claim, a plaintiff can satisfy a two-pronged test: "(1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness ... [is] present.'" *Id.* Factors establishing that the entities acted as a single economic unit include "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder." *United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D.Del.1988), *aff'd*, 879 F.2d 860 (3d Cir.1989).[18] No single factor justifies a decision to disregard the corporate entity, rather some combination of factors is required, and an overall element of injustice or unfairness must always be present. See *Acciai Speciali Terni USA, Inc. v. Momene*, 202 F.Supp.2d 203, 207 (S.D.N.Y. 2002).

On the other hand, mere allegations of domination or control by one entity over another are insufficient; in the context of veil piercing, "it is not sufficient at the pleading stage to make conclusory allegations of control." *In re Sunbeam Corp.*, 284 B.R. at 366. Rather, "[t]he extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own. There must be an abuse of the corporate form to effect a fraud or an injustice—some sort of elaborate shell game." *Id.* To survive a motion to dismiss, a plaintiff must allege facts that the controlling owners operated the company as an "incorporated pocketbook" and used the corporate form to shield themselves from liability. *United States v. Golden Acres, Inc.*, 702 F.Supp. at 1105–07; *In re Sunbeam Corp.*, 284 B.R. at 368. Further, the plaintiff must plead facts showing that the "corporation [is] a sham and exist[s]

**18.** In determining whether the corporate form has been misused under Delaware law, the influential *Fletcher* case considered the following factors: (1) whether the corporation was adequately capitalized for the corporate undertaking; (2) whether the corporation was solvent; (3) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant shareholders siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for the dominant shareholder. See *Fletcher v. Atex, Inc.*, 68 F.3d at 1458; see also, *In re Sunbeam Corp.*, 284 B.R. at 365.

for no other purpose than as a vehicle for fraud." *Wallace v. Wood,* 752 A.2d 1175, 1184 (Del.Ch.1999); see also *Brown v. General Elec. Corp. (In re Foxmeyer Corp.),* 290 B.R. 229, 236 (Bankr.D.Del. 2003). ("The fraud or similar injustice that must be demonstrated in order to pierce the corporate veil under Delaware law must, in particular, be found in the defendant's use of the corporate form.")

In support of her argument that the corporate veil of the Debtor should be disregarded, the Trustee points to the following factors: (i) there was significant overlap in the directors of the Debtor, TPAC and Sky; (ii) Mandell had an ownership interest in all of the entities; (iii) Mandell and Passaro were affiliated with Sky, and became involved in the Debtor's operations; and (iv) Mandell and Recca, through TPAC and Sky, dominated and controlled the Debtor for their own personal gain and used TPAC and the Debtor as an "incorporated pocketbook."

These are insufficient allegations to state a claim that the Debtor, TPAC and Sky operated as a single entity and that there was an overall element of injustice or unfairness present that *arose from* abuse of the corporate form. An overlap in ownership, officers and directors and responsibilities is not uncommon or impermissible. See *Fletcher v. Atex, Inc.,* 68 F.3d at 1459–60. The Trustee argues that the Debtor merely served as a tool to further Defendants' interests, and that this indicates an overall element of injustice. But the Trustee does not back up this claim, and without specific allegations, the claim alone cannot support a finding that the Debtor was used improperly for the benefit of TPAC or Sky. See *In re Foxmeyer Corp.,* 290 B.R. at 236.

Moreover, the Complaint recognizes that the Debtor was operating as a travel agency for a sustained period prior to bankruptcy, and that it received a substantial cash infusion from TPAC. There is no allegation that the Defendants siphoned funds from TPAC. The foregoing is all inconsistent with the contention that the Debtor was a mere shell, and the existence of separate operating companies usually negates a piercing of the veil. See *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.,* 456 F.Supp. 831, 845–46 (D.Del. 1978).

There is no question that the Complaint accuses the Defendants with wrongful conduct. But the allegations are insufficient to support a claim for piercing the corporate veil of the Debtor.

*Claim Thirteen—Disallowance of TPAC and Sky's Claims as Contributions to Capital*

Finally, the Trustee seeks to disallow TPAC's claim and have the loans be deemed a contribution to capital. TPAC argues that the loans were arm's length transactions, and that the Trustee has made no showing to withstand the motion to dismiss.

It is possible to move to recharacterize a loan as an equity contribution, and courts generally consider eleven factors in such a motion: (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or inadequacy of capitalization; (vi) the identity of interest between the creditor and the stockholder; (vii) the security, if any for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claims of outside creditors; (x) the extent to which the advances

were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments. See *In re Exide Technologies, Inc.*, 299 B.R. 732, 740 (Bankr.D.Del.2003). The Complaint does not contain adequate allegations as to any of these factors. This claim is accordingly dismissed.

## *CONCLUSION*

The motions are disposed of as follows:

1. *Count One:* dismissed as to all Defendants for failure to plead with particularity as required by Rule 9(b). Because the fraud claim is dismissed, the Defendants' claim for summary judgment need not be reached.

2. *Count Two:* dismissed as to Golub & Golub for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty, and Passaro for aiding and abetting a breach of fiduciary duty. As to Mandell and Recca, however, the motion to dismiss and the motion for summary judgment are denied. The claim for "Fraud Upon the Court" is dismissed as to all named Defendants, including Mandell, Recca, Golub & Golub and Passaro.

3. *Count Three:* the motion to dismiss is denied, as is the motion for summary judgment as to the named Defendants TPAC and Sky.

4. *Count Four:* dismissed as to the named Defendants TPAC, Mandell and Recca, but with leave to replead as to the turnover of the Debtor's antique car or its proceeds.

5. *Count Five:* dismissed as to all Defendants.

6. *Counts Six, Seven & Eight:* the motion to dismiss is denied as the Trustee has sufficiently alleged a claim for fraudulent transfer as to the $25,000 payment to Sky and as to the $50,000 payment to Zeigler Zeigler & Altman; the Trustee may restate the allegations of this Count accordingly.

7. *Count Nine:* dismissed as to all Defendants.

8. *Count Ten:* dismissed as to Golub & Golub and Zeigler Zeigler & Altman. The Count is dismissed as to the remaining Defendants except that the Trustee's claim for conversion as it relates only to the Debtor's antique car or its proceeds is not dismissed. The Trustee is also granted leave to plead a claim against the relevant parties for failure to conduct an appropriate foreclosure sale.

9. *Count Eleven:* dismissed as to the named Defendants, Mandell and Recca.

10. *Count Twelve:* dismissed as to the only named Defendant, Golub & Golub.

11. *Count Thirteen:* dismissed as to the named Defendants, TPAC and Sky. Defendants shall settle an appropriate order on five days' notice.